190 N.J. Super. 153 (1983)
462 A.2d 595
NEPTUNE T.V. & APPLIANCE SERVICE, INC., A CORPORATION OF THE STATE OF NEW JERSEY, PLAINTIFF-APPELLANT,
v.
LITTON MICROWAVE COOKING PRODUCTS DIVISION, LITTON SYSTEMS, INC., A DELAWARE CORPORATION, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Submitted May 3, 1983.
Decided June 7, 1983.
*156 Before Judges MICHELS, PRESSLER and TRAUTWEIN.
Thompson & Stoller, attorneys for the appellant (David T. Stoller, on the brief).
Smith, Kramer, Morrison & Posner, attorneys for the respondent (David H. Posner, of counsel; David Posner and Edward O. Kenlan, Jr., on the brief).
The opinion of the court was delivered by PRESSLER, J.A.D.
This appeal projects substantial questions regarding the definition of a franchise entitled to the protection of the New Jersey Franchise Practices Act, N.J.S.A. 56:10-1, et seq. We agree with the determination of the trial judge, but not for the reasons relied upon by him, that the contract here in issue did not constitute a franchise agreement within the statutory intendment. Accordingly, we affirm the summary judgment here appealed from dismissing the complaint which sought relief pursuant to the Act.
Plaintiff, Neptune T.V. & Appliance Service, Inc. (Neptune), was in the appliance repair business in Monmouth County in 1974 when it entered into what was denominated as a service contract agreement with defendant Litton Microwave Cooking Products Division, Litton Systems, Inc. (Litton), a manufacturer of microwave ovens sold both to commercial and domestic customers. Pursuant to the terms of that contract, Neptune was designated as "an Authorized Litton service source" for "Freehold, N.J. (50-mile radius)." Neptune's undertaking was to repair Litton's ovens at the behest of the customer both during and after the warranty period. Warranty repairs were to be billed directly to and paid for by Litton. Post-warranty repairs were to be billed to and paid for by the customer. The contract *157 incorporated the terms and conditions of the Litton Service Policy and Procedural Guide, a manual containing detailed provisions regarding the performing of and billing for warranty work, parts inventory requirements, attendance at Litton training sessions, the handling of customer complaints and the like.
Although the contract expressly stipulated that Neptune was an independent contractor and neither an agent nor an employee of Litton, Neptune was nevertheless authorized to represent and hold itself out as an authorized Litton service source in its advertising, letterheads, calling cards and service vehicle markings. Finally, the contract provided for termination by either party with or without cause on 30 days notice, Litton to have the option on termination of repurchasing Neptune's remaining inventory of Litton repair parts.
The agreement continued in effect until December 1981 when Litton, without any indication of reason, gave Neptune notice of termination pursuant to the terms of the contract. By that time, according to Neptune's certification, it was doing an annual gross sales volume with Litton of $70,000 and the Litton work accounted for 38% of its own gross income. Litton disputed these calculations, claiming that the actual gross sales as between it and Neptune for the twelve months preceding the termination was less than $35,000 and accounted for less than 20% of Neptune's over-all gross business receipts.[1] In any *158 event, Neptune's calculations did not clearly distinguish between the in-warranty and out-of-warranty work although it appears that a substantial portion of its repairs of Litton's ovens were out-of-warranty. Finally, it is not disputed that while the effect of the termination is to withhold from Neptune the in-warranty work and the right to hold itself out as an authorized Litton service source, Neptune nevertheless remains free to continue to service and repair Litton ovens after warranty expiration.
Upon receipt of the termination notice, Neptune commenced this action to enjoin the termination, claiming that its contract with Litton constituted a protectible franchise under the New Jersey Franchise Practices Act, and hence that the termination without cause contravened N.J.S.A. 56:10-5. On Litton's summary judgment motion, the court concluded, based on the foregoing facts, that the contract did not constitute a franchise. Accordingly, it dismissed the complaint. We agree that the arrangement between the parties here was not a franchise.
A franchise within the statutory intendment is defined by N.J.S.A. 56:10-3(a) as
* * * a written arrangement for a definite or indefinite period, in which a person grants to another person a license to use a trade name, trade mark, service mark, or related characteristics, and in which there is a community of interest in the marketing of goods or services at wholesale, retail, by lease, agreement, or otherwise.
There are thus two definitional criteria of a franchise, both of which must be met in order for the agreement to come within the statutory orbit. The first is a grant by the alleged franchisor to the alleged franchisee of a license permitting him to use the franchisor's trade name. The second is the sharing by both parties of a community of interest in a business enterprise. The basis of the trial judge's determination was his view that the agreement failed to meet the first of the definitional criteria. While we disagree with that conclusion, we are nevertheless satisfied from the undisputed facts that, as a matter of law, the agreement failed to meet the "community of interest" element of the definition.
*159 As to the first definitional criterion, the trial judge concluded that the provision of the agreement constituting Neptune an independent contractor and prohibiting it from holding itself out as an agent or employee of Litton was antithetical to a conclusion that Litton had accorded Neptune a license to use its trade name. We do not, however, view these two propositions as bearing that consequential relationship or as being otherwise mutually exclusive. Indeed, franchise restrictions against representation by the franchisee of agency or employee status are not atypical of franchise agreements and are in fact consistent with the legal independence of the franchisee which is regarded as an essential element of the franchise relationship. See 1 Glickman, Franchising § 10.02[2] at 10-22 to 10-25 (1969 and supp. through 1982); Thompson, Franchise Operations and Antitrust, 7-8 (1971).
Nor do we regard the trial court's conclusion as supported by Finlay & Associates v. Borg-Warner, 146 N.J. Super. 210 (Law Div. 1976), aff'd 155 N.J. Super. 331 (App.Div. 1978) (review limited to antitrust holding). Borg-Warner involved a contract according plaintiff an exclusive distributorship for defendant's products by a contract which placed no controls on plaintiff's sales or manner of operation but which authorized it to list defendant's products in its catalogues, to advertise defendant's name in its promotional materials and to otherwise represent itself as a distributor of defendant's products. The court there held that
Mere furnishing of advertising materials as contemplated by the distributorship agreement, and allowing plaintiff to have its name placed on certain items, if it wished, as advertising (plaintiff using its own business name) for their own benefit does not fulfill the letter or intent of the Franchise Practices Act. Obviously, someone who sells a product has to, or wants to, make known that he has it. Distributing advertising materials of another's products, with or without plaintiff's name, or having those materials available, including catalogs, or participating in advertising or listing advertisements that certain individuals or businesses sell certain products, is not what is meant by a license to use the various items referred to in the statute. [146 N.J. Super. at 219]
Similarly, in Business Incentives Co., Inc. v. Sony Corp. of America, 397 F. Supp. 63 (S.D.N.Y. 1975) it was held that a *160 manufacturer's sales representative agreement, authorizing plaintiff to use Sony's name in soliciting sales was not a franchise under the New Jersey Franchise Practices Act since plaintiff necessarily had to use Sony's name in persuading potential customers to place orders, but only in the same manner as would any other sales representative. This did not constitute a license to use a trade name. In neither of these cases was the plaintiff authorized to use defendant's trade name in the marketing of its own goods or services. In neither case did the plaintiff significantly contribute, by its own efforts, to the product or service distributed to the public under the defendant's name. Cf. Martin Investors, Inc. v. Vander Bie, 269 N.W.2d 868, 874 (Minn.Sup.Ct. 1978).
Thus, this case authority simply stands for the proposition that limited use by an independent contractor of another's trade name in that contractor's own business advertising does not ipso facto constitute a license to use a trademark within the intendment of franchise legislation. This is so because a hallmark of the franchise relationship is the use of another's trade name in such a manner as to create a reasonable belief on the part of the consuming public that there is a connection between the trade name licensor and licensee by which the licensor vouches, as it were, for the activity of the licensee in respect of the subject of the trade name. See Susser v. Carvel Corporation, 206 F. Supp. 636, 640 (S.D.N.Y. 1962), aff'd 332 F.2d 505 (2d Cir.1964), app. dism. 381 U.S. 125, 85 S.Ct. 1364, 14 L.Ed.2d 284 (1965), in which the court explained that
* * * the cornerstone of a franchise system must be the trademark or trade name of a product. It is this uniformity of product and control of its quality and distribution which causes the public to turn to franchise stores for the product.
We are satisfied that this hallmark was present here since by its designation of Neptune as an authorized service center and its authorization to Neptune to hold itself out as such in its advertising, Litton gave its imprimatur to Neptune's business enterprise in respect of Litton's product and induced the consuming public to expect from Neptune a uniformly *161 acceptable and quality controlled service endorsed by Litton itself. Under these circumstances we are persuaded that the extent of Litton's authorization to Neptune to use the Litton name was sufficient to constitute a license as contemplated by the Act.
The more difficult problem here is whether the arrangement between the parties here also included the requisite element of their "community of interest in the marketing of goods or services." The New Jersey Act does not undertake to define that phrase and no reported New Jersey case has considered the legislative intent in employing it. In according it substantive content, therefore, we look to other jurisdictions which have similar franchise statutes employing similar language and to the nature of the franchise relationship itself. Insofar as we are able to determine, Wisconsin, Washington and Hawaii have statutes similarly defining franchise, but which also define the "community of interest" element of a franchise. Both Washington and Hawaii define it as "a continuing financial interest between the franchisor and franchisee in the operation of the franchise business." Washington Franchise Investment Protection Act, Wash. Rev. Code 19.100.010(2); Hawaii Franchise Investment Law, Hawaii Rev.Stat. § 482E-2. Wisconsin defines the term, almost identically, as meaning "a continuing financial interest between the grantor and grantee in either the operation of the dealership business or the marketing of such goods or services * * *." Wisconsin Fair Dealership Law, Wis. Stat. § 135.02(4).
While the standard of "a continuing financial interest" is not by itself significantly elucidative of the "community of interest" requisite, its import can be understood in the context of the nature of franchising and the abuses to which this form of business enterprise is singularly susceptible and which were intended to be remedied by N.J.S.A. 56:10-1, et seq.
Franchising is essentially a method of doing business or a method of distribution which combines the advantages of an *162 integrated corporate network with those advantages inherent in individual business proprietorships. See generally, Rosenfield, The Law of Franchising, 4-8 (1970); Brown, Franchising-Realities and Remedies, 2-21 (1978); Thompson, Franchise Operations and Antitrust, 5-17 (1971); F.T.C. Statement on "Disclosure Requirements and Prohibitions Concerning Franchising and Business Opportunity Ventures" [16 C.F.R. § 436], 43 Fed.Reg. 59,697-59,710 (1978).
From the point of view of the franchisor who has a potentially successful product or marketing concept but who is unable or unwilling to commit the capital, manpower or organization necessary to develop it, the franchise relationship, which takes advantage of the franchisee's capital and labor, affords him a viable alternative for rapid expansion and exploitation of growing markets. Rosenfield, supra at 5-9. In addition to the benefit which the franchisor obtains through franchisee-financed growth, the franchisor is also able to avoid the inefficiencies and costs of centralized management and control of a large and geographically diverse organization. The franchisor is, furthermore, insulated to a significant degree from the failure of an individual franchise operation but benefits significantly from the success of the other franchisees, each of whom contributes good will for the entire network. See Brown, supra, at 8 to 10. The franchisee, in turn, acquires an instant public reputation based on system-wide promotion and the good will already established by other franchises. This factor, which enables an individual entrepreneur to compete with large corporate chains and nationally marketed brand-name goods and services, has been recognized as a leading cause of the rapid growth of franchising in the last several decades. Rosenfield, supra, at 7-8. The franchisee also benefits from the franchisor's standardized management system, its training, guidance and supervision. Thus, the franchise system has been described as "the last frontier of the independent businessman." Brown, supra, at 2, 6-7. See also Rosenfield, supra, at 17-18.
*163 In short, the franchise relationship is one of continuing mutual advantage and interdependence. The franchisor utilizes the system to distribute his products or capitalize upon his service marketing scheme without the need of establishing his own related marketing divisions and thus utilizes the network to do his business or an essential aspect of it for him. The franchisee receives the benefit of the franchisor's know-how and reputation and contributes his own capital and labor. In a sense, therefore, the franchise relationship is akin to a partnership since both parties derive their respective incomes from the franchise. They are, obviously, however, not partners in the true sense of sharing profits and losses. See 1, Glickman, Franchising § 2.03[7] and [8] (1969 supp. through 1982). Accordingly, the community of interest signalling the franchise relationship does not imply a sharing of profits. See Lobdell v. Sugar'n Spice, Inc., 33 Wash. App. 881, 658 P.2d 1267, 1273-1274 (Ct.App. 1983). Rather it is based on the complex of mutual and continuing advantages which induced the franchisor to reach his ultimate consumer through entities other than his own which, although legally separate, are nevertheless economically dependent upon him.
Despite these characteristics of mutuality of interest, there is also, however, significant divergence of interest between the franchisor and franchisee. Thus, where the franchise is for the distribution of the franchisor's products, the franchisor is primarily interested in the volume of the franchisee's sales, not necessarily the franchisee's profitability. So long as the franchisor benefits from the increased public exposure and distribution of its goods, it matters little to him whether or not a particular franchisee can continue in business since there will always be another franchisee available to assume that place in the distribution network. See, e.g., Shell Oil Co. v. Marinello, 63 N.J. 402, 409 (1973). Conversely, once a franchisee has succeeded by his efforts and capital in establishing a local reputation for the franchise name, he is vulnerable to termination of the franchise, forfeiture of the business good will and the inability *164 to realize the benefits of his business by selling it to another prospective franchisee. Thus, the reputation and good will of the network, created primarily by the efforts of each of the individual franchisees, passes back to the franchisor without compensation to the franchisee.[2]
It was clearly the potential for abuse attendant upon an arbitrary and uncompensated termination of the franchise which franchise practice legislation was intended to address. See Statement annexed to Assembly Bill 2063 (1971) enacted as N.J.S.A. 56:10-1, et seq.; the veto message of Governor Cahill which resulted in amendment of Assembly Bill 2063 as therein recommended; Public Hearing before the Assembly Judiciary Committee on Assembly Bill 2063 (March 29, 1971). And see generally Brown, supra, at 5. It is also clear that the characteristics of the franchise relationship which create this abuse potential do not inhere in every business arrangement by which one promotes the reputation of another's trade name. That aspect of the arrangement  its licensing element  must be coupled with a community of interest between the parties as heretofore described before the abuse potential is triggered and in order for the arrangement to qualify for franchise status. Thus, illustratively, such non-franchise relationships include an employee or individual contractor performing services for a publicly known company, or a specialty shop or concessionaire leasing space within a publicly known department store, or a marketing sales representative serving a brand-name company, or a retail distributor *165 who also displays the manufacturer's promotional materials. See, e.g., 1 Glickman, Franchising § 2.03; Thompson, supra, at 5-9. And see Finlay & Associates v. Borg-Warner, supra, 146 N.J. Super. at 219.
In view of the foregoing we conclude that however broad, elastic and elusive the concept of "community of interest" may be, it does not include the arrangement between the parties here for the reason that that arrangement lacked, in substantial measure, both the symbiotic character of a true franchise arrangement and the consequent vulnerability of the alleged franchisee to an unconscionable loss of his tangible and intangible equities.
This conclusion comports with the recent holding of the Wisconsin Supreme Court in Kania v. Airborne Freight Corp., 99 Wis.2d 746, 300 N.W.2d 63 (Wis.Sup.Ct. 1981), a case whose facts are closely analogous to those here before us. Involved there was a cartage contract between an air freight forwarder and a local delivery service. The question before the Wisconsin court was whether the relationship was characterized by a community of interest sufficient to invoke the protection of that state's franchise protection legislation.[3] The business there of defendant Airborne was the rapid air transport of shipments between distant cities. It contracted with plaintiff Kania for the pickup and delivery of customers' packages to and from the Milwaukee airport and to and from their homes or businesses in the *166 Milwaukee area. Kania continued to service its own customers while fulfilling substantially all of Airborne's local service needs. Kania was compensated directly by Airborne, which in turn billed its customers in accordance with the applicable tariff schedule. The contract specifically provided that Kania was permitted to use Airborne's good will and name in its advertising, and in fact Kania's delivery trucks were painted with the Airborne color and logotype and Kania's employees wore Airborne uniforms. Eventually Kania's receipts from its Airborne services pursuant to the contract grew to over 80% of its business. Nevertheless, the court held that the agreement between the parties did not meet the statutory definition since the parties did not share a continuing financial interest in either the operation of the dealership business or in the marketing of the grantor's goods or services. 300 N.W.2d at 72-73. The court explained its reasoning as follows:
While it is true that Kania personally does have a general economic interest in the promotion of Airborne's delivery service solely because he stands to benefit from a greater demand for Airborne's services and thus receive greater personal business income, we do not agree that the legislature intended that the continuing financial interest in the marketing of the grantor's (Airborne) services element of the community of interest definition could be satisfied by this type of interest. Kania's construction of a community of interest is far too elastic or broad to be approved.
* * * * * * * *
The record establishes that Kania's only participation in the operation of Airborne's local delivery service was the physical transportation of parcels to and from the airport. Kania was hired as an independent contractor and was paid for his transportation services on a weekly basis at a specified rate. He did not share in Airborne's business profits or losses and also bore no risk for losses incurred resulting from Airborne's non-paying customers. Further, Kania was not authorized to sell Airborne's services and did not bill Airborne's customers for his services, but, rather, looked to Airborne for payment.
* * * * * * * *
The cartage contract as written and performed appears to put the plaintiff more in the category of a piece work employee rather than a dealer under ch. 135. The more packages or parcels of freight Kania delivers to or from the airport, the greater his income, rather than a dealer who openly solicits and sells services or products and is paid on a commission basis, as compared with a flat rate payment for geographical area. Thus, considering the total relationship of the *167 parties, we hold that Kania failed to establish a continuing financial interest in the operation of Airborne's delivery service and, therefore, the plaintiff failed to fulfill the statutory element of a community of interest in the "offering, selling or distributing" of Airborne's services. [Id. at 72-74].
We concur with the rationale of the Wisconsin Court. Accordingly, we conclude that the service contract between Neptune and Litton did not involve a community of interest as required by the New Jersey Franchise Practices Act. Litton's only interest in Neptune's repair business was that Neptune not perform its repairs in an unsatisfactory manner, thereby detracting from Litton's reputation as a manufacturer of well-made and serviceable appliances. Litton had no other interest in the volume of plaintiff's business and its own primary interests were indeed best served by the necessity for as few warranty repairs as possible. Neptune's reputation for performing satisfactory repairs could not enhance Litton sales except in a negative sense. Litton is, after all, in the business of selling appliances and its reputational interests are accordingly best served by manufacturing trouble-free appliances. In providing a source for repair servicing, Neptune, of course, played a necessary role in the marketing of Litton appliances but not a role reasonably construable as conjoining it to Litton in an interdependent and continuing financial interest in each other's business. Litton merely contracted for the availability of satisfactory auxiliary servicing to the buyers of its products from a repair source of appliances generally. Litton did not otherwise profit from the repair operations or in any sense `do its own business' through them. Nor is Neptune susceptible to the injustices to which franchisees are traditionally particularly vulnerable since the service contract did not create the potential for inequitable financial leverage. Neptune's service reputation did not accrue to enhance Litton's reputation as an appliance manufacturer upon the termination of the contract. Most importantly, however, Neptune did not contribute toward building up Litton's business and is accordingly not arguably entitled to share in it. In short, Neptune was not the source of Litton's business; rather, Litton was the source of Neptune's trade. *168 Considering all of these circumstances, we are satisfied that the reasoning of Kania v. Airborne Freight Corp., supra, is fully applicable that there was no requisite community of interest between the parties and consequently that their agreement did not create a franchise.
Affirmed.
NOTES
[1] The significance of this dispute implicates N.J.S.A. 56:10-4, which limits the applicability of the act to those franchises (1) the performance of which contemplates or requires the franchisee to establish or maintain a place of business within the State of New Jersey, (2) where gross sales of products or services between the franchisor and franchisee covered by such franchise shall have exceeded $35,000.00 for the 12 months next preceding the institution of suit pursuant to this act, and (3) where more than 20% of the franchisee's gross sales are intended to be or are derived from such franchise. Since the trial judge concluded that the agreement here did not meet the definition of franchise prescribed by N.J.S.A. 56:10-3(a), he concluded that the dispute as to gross sales between the parties and the percentage of plaintiff's business represented thereby did not require resolution. We concur.
[2] If the franchise agreement requires that the franchisee purchase its supplies and materials from the franchisor or `approved suppliers,' as with fast food franchises the franchisor may derive a large portion of its profits from markups on the materials, to the detriment of the franchise. On the other hand, if the franchisor derives its profits `up front' by the sale of the franchise, its interest in the ongoing profitability of the individual franchised operation will be secondary. This concern underlies the suggestion that franchise sales should be treated akin to securities offerings. See generally, FTC statement on 16 C.F.R. § 436 (Franchise Disclosure Rule), 43 Fed.Reg. 59,697-59,699 (1978); Rudnick & Young, "A Primer on the Regulation of Franchise Sales," 1980 Ariz. State L.J. 453.
[3] Wisconsin has two separate statutes pertaining to franchises. The Wisconsin Franchise Investment Law, Wis. Stat. § 553.01 et seq., regulates the registration and offering for sale of franchises, akin to statutory regulation of new securities offerings. The Wisconsin Fair Dealership Law, Wis. Stat. § 135.01 et seq., invoked by the plaintiff in Kania, is similar in operation to the New Jersey Act and its definition of "dealership" is essentially equivalent to the definition of franchise in N.J.S.A. 56:10-3(a). Originally proposed as the "Wisconsin Fair Franchising Law," it was subsequently amended to refer to `dealerships' in order to avoid possible confusion with the investment statute. The `dealership' definition was nevertheless intended to apply to franchise relationships. See Foerster, Inc. v. Atlas Metal Parts Co., 105 Wis.2d 17, 313 N.W.2d 60, 63 (Sup.Ct. 1981).