211 N.J. Super. 84 (1986)
510 A.2d 1197
THEODORE R. MORGAN, PLAINTIFF,
v.
AIR BROOK LIMOUSINE, INC., DEFENDANT.
Superior Court of New Jersey, Law Division Essex County.
Decided January 31, 1986.
Supplemented March 17, 1986.
*86 Joel P. Kraemer for plaintiff (Carella, Byrne, Bain & Gilfillan, attorneys).
John K. Walsh, Jr. for defendant (Walsh and Dimin, attorneys).
Cindy K. Miller, Dep. Atty. Gen., for intervenor State of New Jersey (W. Cary Edwards, Atty. Gen. of New Jersey, attorney).
VILLANUEVA, J.
Plaintiff's complaint alleges various causes of action for fraud arising out of his obtaining a franchise to operate a limousine service from defendant.
The sole issue involved in cross motions for summary judgment is whether the New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1 et seq., applies to a franchise relationship.
*87 The court holds that it does apply because a franchise or business opportunity venture is "merchandise" within the intendment of the Act.
Since plaintiff's attorney failed to notify the Attorney General of this action, in accordance with N.J.S.A. 56:8-20, the court directed the attorney to do so to determine if he wanted to intervene or appear. As a result thereof, the Attorney General has appeared in support of plaintiff's position, arguing that the Act is not restricted to consumer retail sales or advertising, that a franchise, including Air Brook's, is merchandise within the intendment of the Act and that the failure of a franchisor, including Air Brook, to provide a prospective franchisee, like Morgan, with a Rule disclosure statement (required by F.T.C. Rule 16 C.F.R. § 436.1) is a per se unconscionable commercial practice, deception, fraud, false pretense, false promise or misrepresentation in violation of § 2 of the Act.

PRELIMINARY STATEMENT
Plaintiff filed a four count complaint alleging causes of action for fraud under the New Jersey Consumer Fraud Act (the "Act")[1], N.J.S.A. 56:8-1; breach of the franchise agreement; violation of Federal Trade Commission Rule 16, C.F.R. § 436.1, dealing with unfair and deceptive practices of a franchisor; and violation of 18 U.S.C. § 1961 et seq., the Racketeer Influenced and Corrupt Organizations Act ("RICO"). Defendant filed a counterclaim for damages for breach of the franchise agreement.
Defendant has moved for summary judgment to dismiss all counts of the complaint except the one for breach of the franchise agreement. Plaintiff has made a cross motion for *88 summary judgment on the first count alleging violation of the Act.
Plaintiff now concedes that he has no private cause of action for a violation of Federal Trade Commission Rule 16 C.F.R. § 436.1, adopted pursuant to 15 U.S.C. § 41 et seq. He also concedes that the count of his complaint alleging "RICO" violations does not set forth a cause of action because he has no standing and has not satisfied the necessary prerequisites for a civil "RICO" action and therefore withdraws those counts. Therefore, these motions are limited to the First Count of the complaint alleging violation of the Act.
The defendant, Air Brook Limousine, Inc., (hereinafter "Air Brook"), conducts a limousine business in New York and New Jersey, wherein it sells franchises to individuals who become drivers of vehicles leased from defendant.
The plaintiff, Theodore Morgan (hereinafter "Morgan"), entered into a franchise agreement with Air Brook on February 29, 1984. Prior to the execution of the agreement, Morgan received a descriptive brochure and sample earning program from Air Brook. Morgan alleges that these documents intentionally omitted material facts concerning the operation of the franchise, intentionally misrepresented the benefits of the obligation and that the material used to induce Morgan to enter into the agreement was likely to, and in fact did, deceive him.
Morgan alleges that Air Brook told him that the numbers shown on Air Brook's sample earnings sheet were minimal and that a driver could do even better. Morgan agreed to accept only rides given to him by Air Brook's dispatcher. Morgan alleges that, as time went on, the rides were insufficient to cover his fixed expenses to Air Brook. Although Morgan worked six days a week and accepted virtually every ride assigned to him, based upon the fees set by Air Brook for the rides, including tips, there was no possible way for him to meet the fixed obligations. He alleges that had he received the proper financial information from Air Brook, there is no way he *89 would have undertaken the risk of entering into the franchise agreement and the lease of the car.
By virtue of these allegations, Morgan seeks to bring the franchise relationship between the parties within the ambit of the New Jersey Consumer Fraud Act by alleging that Air Brook violated the Act by soliciting him to enter into the franchise obligation by the use of certain materials.
Air Brook denied these allegations in its Answer and set forth seven Separate Defenses to this claim, including: (a) the Act does not apply to the transaction or the relationship between Morgan and Air Brook; (b) no merchandise was offered for sale to the public, directly or indirectly, by Air Brook; (c) Air Brook was not engaged in the sale or advertisement of any merchandise; (d) Air Brook did not engage in any act or practice violative of § 2 of the Act; (e) any statements made by Air Brook were made in good faith; (f) Morgan is not a consumer or a protected person within the intendment of the Act; (g) Air Brook's written materials did not intentionally omit material facts and did not intentionally misrepresent the benefits.
Morgan alleged in his motion for summary judgment that Air Brook had sold merchandise within the intendment of the Act and that Air Brook's failure to provide him with the written disclosure statement required by the Federal Trade Commission, 16 C.F.R. § 436 ("Rule"), lent further support to his claim that Air Brook had omitted and misrepresented its operation and benefits in violation of § 2 of the Act.
Air Brook, in its motion for summary judgment, maintained that the Act does not apply because it applies only to sales or advertising of merchandise at the retail level and not to an investment or a for-profit type of transaction and even assuming that the Act did apply to the parties' transaction, the failure to provide the Rule's disclosure statement to Morgan did not constitute a violation of § 2 of the Act.
*90 It is undisputed that a Rule disclosure statement was not provided to Morgan although certain Air Brook promotional and informational materials were provided. There also is nothing in the record to indicate that the internal operation of Air Brook is subject to the regulatory or supervisory control of any agency, federal or state.

THE ACT IS NOT RESTRICTED TO CONSUMER RETAIL SALES OR ADVERTISING.
Air Brook's argument that the Act only applies to retail consumer sales or advertising is without support. Preliminarily, it should be noted that Air Brook's reference to the Division of Consumer Affairs ("Division") regulations governing merchandise advertising, N.J.A.C. 13:45A-9.1 et seq. ("Advertising Regulations"), to support its argument that only the retail level of sales or advertising is encompassed by the Act, is incorrect. The Advertising Regulations, promulgated pursuant to § 4 of the Act ("To accomplish the objectives and to carry out the duties prescribed by this act, the Attorney General ... may ... promulgate such rules and regulations ... which shall have the force of law"), represent the Attorney General's determination that greater protection against deception in merchandise advertising on the retail level is necessary. No such "retail restriction" is contained anywhere within § 2 of the Act. Indeed, the regulations governing the jurisdiction of the Division to adjudicate matters involving a violation of the Act or regulations promulgated thereunder specifically employ the Act's § 1 definition of merchandise in which no "retail restriction" exists. N.J.A.C. 13:45A-2.1(a) and (b).
The Act defines advertisement as including:
The attempt directly or indirectly by publication, dissemination, solicitation, indorsement or circulation or in any other way to induce directly or indirectly any person to enter or not enter into any obligation or acquire any title or interest in any merchandise or to increase the consumption thereof or to make any loan;.... [Emphasis supplied; N.J.S.A. 56:8-1(a).]
*91 Thus, when a franchisor solicits a person to enter into an obligation for a franchise, that transaction falls within the aforesaid definition of advertisement.
Section 2 of the Act declares the following practices to be unlawful:
The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby;.... [Emphasis supplied.]
For purposes of applying § 2 of the Act to a particular transaction, several words contained therein are expressly defined in § 1 and are not given their ordinary or generally accepted meaning. The term "person" is defined as "any natural person or his legal representative, partnership, corporation, company, trust, business entity or association, and any agent, employee, salesman, partner, officer, director, member, stockholder, associate, trustee or cestuis que trustent thereof". [Emphasis supplied.] The term "sale" is defined as "any sale, rental or distribution, offer for sale, rental or distribution or attempt directly or indirectly to sell, rent or distribute." The term "merchandise" shall include "any objects, wares, goods, commodities, services or anything offered, directly or indirectly to the public for sale." [Emphasis supplied.] Moreover, by the repetition of the term "person" (as defined in § 1) within § 2, an express indication of § 2's application to transactions involving more than the ordinary retail merchant and personal consumption consumer is apparent.
It is a cardinal principle of statutory construction that "the words and phrases contained in [a] statute should be given their ordinary and well-understood meaning." DeHart v. Bambrick, 177 N.J. Super. 541, 549 (App.Div. 1981), citing Fahey v. Jersey City, 52 N.J. 103, 107 (1968); Kingsley v. Hawthorne Fabrics, Inc., 41 N.J. 521, 526 (1964). Nonetheless, this principle only *92 governs "in the absence of explicit indication of a special meaning." In re Barnert Memorial Hosp. Rates, 92 N.J. 31, 40 (1983), citing Levin v. Parsippany-Troy Hills Tp., 82 N.J. 174, 182 (1980); Safeway Trails, Inc. v. Furman, 41 N.J. 467, 478 (1964), cert. den. 379 U.S. 14, 85 S.Ct. 144, 13 L.Ed.2d 84 (1964); See Serv. Armament Co. v. Hyland, 70 N.J. 550, 556 (1976). This overriding principle of statutory construction has been legislatively recognized in N.J.S.A. 1:1-1, which provides:
1:1-1 General Rules of construction
In the construction of the laws and statutes of this state, both civil and criminal, words and phrases shall be read and construed with their context, and shall, unless inconsistent with the manifest intent of the legislature or unless another or different meaning is expressly indicated, be given their generally accepted meaning, according to the approved usage of the language. Technical words and phrases, and words and phrases having a special or accepted meaning in the law, shall be construed in accordance with such technical or special and accepted meaning. [Emphasis supplied.]
Because the Legislature has expressly defined the term "person" to include individuals and business entities as both violators and aggrieved parties,[2] a court has no authority to lessen the reach of the Act and is, in fact, bound by the definition. Febbi v. Div. of Employment Sec., 35 N.J. 601, 606 (1961), citing 2 Sutherland, Statutory Construction, §§ 3002, 4814 (3d ed. 1943); Eagle Truck Transp., Inc. v. Bd. of Review, etc., 29 N.J. 280, 289 (1959). Indeed the Appellate Division, recognizing the scope of the Act and its well-defined terms, recently concluded that a business entity is a "person" under § 1 of the Act and "may qualify as a consumer" for purposes of the protection of § 2 of the Act. D'Ercole Sales, Inc. v. Fruehauf Corp., 206 N.J. Super. 11, 23 (App.Div. 1985). This court believes this conclusion was correctly made based upon the recognition that no definition of "consumer" is contained within § 1 *93 of the Act in contra-distinction to the express definition of "consumer" in other statutes, which restrict the definition to individual person, family or household consumption purposes, Ibid. n. 2, or to retail transactions. See N.J.S.A. 56:8-22, defining "consumer commodity" for purposes of the Unit Price Disclosure Act, N.J.S.A. 56:8-21 et seq., and including within that definition a "retail sale" restriction.[3]
In another case recently considered by the Appellate Division, the court noted that the Act's "definitional sections are very broad." New Mea Const. Corp. v. Harper, 203 N.J. Super. 486, 499 (App.Div. 1985). Holding that the Act was "applicable to a custom builder who uses substandard material in the construction of a house[,]" Id. at 501, the court reaffirmed the well-established principles governing the liberal construction of the Act's remedial provisions:
The available legislative history demonstrates that the act was intended to be "one of the strongest consumer protection laws in the nation." See Skeer v. EMK Motors, Inc., 187 N.J. Super. 465, 471-473 [(App.Div. 1982)]. We deem it our responsibility to construe the Act broadly, not in a crabbed fashion which would provide an exemption for a custom builder, an exemption we do not think the legislature ever intended to bestow. Statutory exceptions "are not to be implied." [Id. at 501-502, footnote omitted; quoting 2A Sutherland, Statutory Construction, § 47.11 at 145 (1984); other citations omitted.]
It is interesting to note that, although the D'Ercole court did not reach the issue presented "whether the transaction concerning the purchase of a tow truck for commercial purposes comes within the scope of the ... Act[,]" D'Ercole, 206 N.J. Super. at 23-25, the application of the Act to non-retail transactions has stood unchallenged for the past 13 years. Kugler v. Koscot Interplanetary, Inc., 120 N.J. Super. 216 (Ch.Div. 1972) ("Koscot"). Koscot involved "the sale and distribution of cosmetics throughout the United States." Id. at 221. This multi-level distribution plan involved sales of distributorships:

*94 which entitled the purchaser to participate in the Koscot marketing plain in two capacities, namely, "retail", i.e., the sale of cosmetics, and "wholesale", i.e., the recruitment and sale of further distributorships. Both segments of the marketing plan provided for the compensation of distributors through a system of commissions related either to the sale of the product or the sale of distributorship positions. [Id. at 223; footnote omitted.]
Indeed, the "total investment" by New Jersey consumers during the period 1969-1971 "exceeded three million dollars." Id. at 225. The court's holding that Koscot's referral sales/multi-level distribution plan was prohibited by the Act, Id. at 233, recognized that the Act was not restricted to retail consumer consumption transactions. See People ex. rel. Scott v. Cardet International, Inc., 24 Ill. App.3d 740, 321 N.E.2d 386, 392 (Ill. App.Ct. 1974) (purchaser of similar multi-level marketing and distribution plan was not within protection of the Illinois Consumer Fraud Act, Ill. Rev. Stat. 1971, ch. 121 1/2, par. 261 et seq., inasmuch as the term "consumer" was restricted to the purchase of merchandise for personal "use or [use by] a member of [one's] household or in connection with the operation of [one's] household. Koscot is distinguished because of the absence of any definition of "consumer" within the Act).
The Act is not restricted to retail consumer consumption transactions and its protective sweep includes transactions in which a person, like Morgan, makes an investment rather than a consumption purchase.

A FRANCHISE OR BUSINESS OPPORTUNITY VENTURE IS MERCHANDISE WITHIN THE INTENDMENT OF THE ACT.
Merchandise is defined within § 1(c) of the Act to include "any objects, wares, goods, commodities, services or anything offered, directly or indirectly, to the public for sale." Air Brook's contention that the franchise rights which it offers to the public for sale are not "merchandise" within the intendment of the Act is erroneous. Indeed, its reliance upon Westervelt v. Gateway Financial Service, 190 N.J. Super. 615 (Ch.Div. 1983), Daaleman v. Elizabethtown Gas Co., 77 N.J. 267 (1978), In re *95 Catanella and E.F. Hutton & Co., Inc., Securities Litigation, 583 F. Supp. 1388 (E.D.Pa. 1984) and Neveroski v. Blair, 141 N.J. Super. 365 (App.Div. 1976), for the proposition that "the Act is not as broad as its literal terms," is misleading and misguided. These cases all involved matters subject to complete supervision and control of a regulatory agency with primary authority to address and resolve the subject matter of the litigation involved. Westervelt, 190 N.J. Super. at 625 (Department of Banking); Daaleman, 77 N.J. at 273 (Board of Public Utilities); In re Catanella, 583 F. Supp. at 1443 (Div. of Consumer Affairs, Bureau of Securities).[4]Neveroski, 141 N.J. Super. at 379 (Dept. of Ins., Real Estate Commn.). It was, thus, the need to avoid "conflicting determinations, rulings and regulations affecting the identical subject matter ..." that predominated. Daaleman, 77 N.J. at 272. See Westervelt, 190 N.J. Super. at 625.
It is true that the Appellate Division in Neveroski, 141 N.J. Super. at 378-379, indicated that members of the learned professions obviously were not subject to the Act notwithstanding that they rendered "services" to the public. That must be distinguished with a franchise or business opportunity venture, which is merchandise within the intendment of the Act. Although the court indicated that the entire thrust of the Act is pointed to products and services sold to consumers in the popular sense, their analysis was not directed at a franchise or business opportunity venture.
In this matter, there is nothing in the record to indicate that Air Brook's franchise advertising and sales practices are subject to the complete supervision and control of a regulatory agency, state or federal, with primary authority to address and resolve the subject matter of Morgan's claims. Air Brook will *96 not be "subjected to two areas of inconsistent regulation [and the subject matter of Morgan's claim will not involve] two distinct and conflicting regulatory schemes." Ibid.[5]
By legislation, a franchisee in New Jersey is entitled to protection from termination and from other practices deemed unlawful. Franchise Practices Act,[6]N.J.S.A. 56:10-1 et seq. ("FPA").[7] Under § 3a of the FPA, a franchise is defined to mean:
a written agreement for a definite or indefinite period, in which a person grants to another a license to use a trade name, trade mark, service mark, or related characteristics, and in which there is a community of interest in the marketing of goods or services at wholesale, retail, by lease, agreement, or otherwise.
Our Legislature, in enacting the Franchise Practices Act, has declared that distribution and sales through franchise arrangements in New Jersey vitally affect the general economy of the State, the public interest and the public welfare. N.J.S.A. 56:10-2. Shell Oil Co. v. Marinello, 63 N.J. 402, 409 (1973). The Legislature, in adopting the FPA, felt that it was "necessary in the public interest to define the relationship and responsibilities of franchisors and franchisees in connection with franchise *97 arrangements." This form of marketing arrangement was considered by the Appellate Division in Neptune T.V. & App. v. Litton Microwave, etc., 190 N.J. Super. 153 (App.Div. 1983). In Neptune T.V., Judge Pressler, writing for the court, held that no franchise relationship existed under the FPA between an appliance repair business and a manufacturer of microwave ovens notwithstanding that the appliance repair business was authorized to use the "Litton" name and designation as an "authorized" service source in the conduct of its business. Lacking in the relationship was the presence of the second criterion  the "community of interest in the marketing of goods or services...." Id. at 167. Inasmuch as the phrase "community of interest in the marketing of goods or services" is not defined within the FPA, the court relied upon other state franchise legislation which also used the phrase, but defined it. Id. at 161. Relying, in part, upon Wisconsin's definition ("a continuing financial interest between the franchisor and franchisee in the operation of the franchise business"), the court determined that the franchise relationship under the FPA required that the franchisee's role in the marketing of the franchisor's goods or services be "reasonably construable as conjoining it to [the franchisor] in an interdependent and continuing financial interest in each other's business." Id. at 167. No such relationship existed between Neptune T.V. and Litton since Litton was in the business of selling trouble-free microwave ovens and Neptune T.V. was in the business of performing post-sale repairs to Litton's microwave ovens, which were clearly not trouble-free. Ibid.
Morgan had the right to use the Air Brook name and, indeed, was required to use the name by way of an Air Brook uniform and automobile designation. Moreover, Air Brook and Morgan had a continuing financial interest in the marketing of Air Brook's service. Morgan's capital and labor only served to enhance and enlarge Air Brook's limousine service market. Conversely, Air Brook's system-wide marketing and promotional *98 network, good will, training and supervision also served to build an instant customer base for Morgan. Thus, the arrangement between Air Brook and Morgan can be reasonably construable as the sale of the right to sell to others (in this case services) by use of another's name and pursuant to another's marketing plan or system in which both parties avail themselves of "mutual advantage and interdependence." Id. at 163.
Although the term "franchise" is not included within § 1(c)'s definition of "merchandise," it is subsumed within the terms "commodities", "services" or "anything offered, directly or indirectly to the public for sale." See, e.g. Koscot, 120 N.J. Super. at 232-233 (purchase of the right to sell was the same right to sell prohibited by the Act). Courts of other states, in construing their own deceptive practices legislation, have come to the same conclusion. Thus, in Bailey Employment System, Inc. v. Hahn, 545 F. Supp. 62 (D.Conn. 1982), aff'd without op. 723 F.2d 895 (2 Cir.1983), the court determined that since a franchise was a form of license or privilege to do business under the franchisor's name or pursuant to the franchisor's marketing plan or system, the sale of a franchise was a "commodity or thing of value" within the statutory definition of "trade or commerce" under Connecticut's Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110a(4), which reads:
"Trade" and "commerce" means the advertising, the sale or rent or lease, the offering for sale or rent or lease, or the distribution of any services and any property, tangible or intanglible, real, personal or mixed, and any other article, commodity, or thing of value in this State [Id. at 66.]
Similarly, in People ex. rel. Scott v. Cardet International, Inc., 321 N.E.2d at 390, the court held that distributorships that marketed household and personal items sold by a marketing franchisor were "services" and "intangibles" within the statutory definition of "merchandise" under the Illinois Consumer Fraud Act, Ill. Rev. Stat. ch. 121 1/2, § 261(b) (legislation which is almost identical to the Act):

*99 any objects, wares, goods, commodities, intanglibles, real estate situated outside the State of Illinois, or services.[8]
The court correctly determined that the franchisor's "agreements [in which a franchisee] acquired the right to use the [franchisor's] trade name ... good will ... and certain operational services to facilitate the carrying on of [business]" amounted to the sale of "services" and "intangibles" within the statutory meaning of "merchandise". Ibid. Thus, the conclusion that the term "services" within § 1(c) of the Act includes the type of operational, supervisory and marketing assistance provided by a franchisor is not without support. Indeed, several states, including California, which have determined to regulate franchise and business opportunity ventures by means of filing and disclosure, include the sale of "services" as within the intendment of such legislation. See, e.g., Cal.Civ.Code § 1812.201(a) and § 1812.201(i) "('Services' includes any assistance, guidance, direction, work, labor or services provided by the seller to initiate or maintain or assist in the initiation or maintenance of business.)" People v. Mott, 140 Cal. App.3d 394, 189 Cal. Rptr. 589, 593, n. 2. (Cal.Ct.App. 1983).
Several courts have held that sales of franchises fall within the ambit of federal and state securities laws. For a summary of the factors courts have considered with regard to whether franchises are regulated by securities laws, see Opinion of Attorney General of Utah, (CCH Blue Sky Reporter, para. 70, 893 [1971]). See also DeSimone v. Nationwide Mut. Ins. Co., 149 N.J. Super. 376, 380 (Law Div. 1977), where the court stated that "assuming, without deciding, that the Act applies to the sale of policies of insurance," it did not apply to plaintiff in that *100 case against an insurer because of the lack of "fraud  unconscionable, deliberate and knowing fraud."
This franchise is offered for sale to the general public as any other merchandise is. No special qualifications or experience are required except having sufficient funds for the down payment.
A franchise or business opportunity is "merchandise" within the intendment of the Act, and therefore, the arrangement between Air Brook and Morgan is subject to the protective sweep of the Act.

THE FAILURE OF A FRANCHISOR TO PROVIDE A PROSPECTIVE FRANCHISEE WITH A RULE DISCLOSURE STATEMENT IS A PER SE UNCONSCIONABLE COMMERCIAL PRACTICE, DECEPTION, FRAUD, FALSE PRETENSE, FALSE PROMISE OR MISREPRESENTATION IN VIOLATION OF § 2 OF THE ACT.
Although Morgan originally alleged a private cause of action under the Rule (Third Count), based upon Air Brook's failure to provide the required Rule disclosure statement, Morgan has acknowledged, as part of his response to Air Brook's motion for summary judgment on the Third Count, that no private cause of action exists. This does not mean, however, that the Rule has no application to that part of Morgan's action which alleges a violation of § 2 of the Act (First Count).
The Rule establishes basic minimum standards for lawful business conduct in the sale, offer for sale and advertising of franchises or business opportunity ventures. It is designed to prevent deception or unfairness in such transactions by prohibiting certain conduct and by imposing affirmative obligations upon those who engage in such transactions. The Rule is a recognition that such transactions often involve consumer commitment of substantial dollars in an attempt to secure self-reliance and security in an independent business, often without the availability of reliable, meaningful and adequate information *101 to make an informed investment decision. Without such information, the consumer's attempt to share in the "American Dream" could result in a nightmare of significant personal and financial proportions.
Pursuant to the Rule, certain forms of continuing commercial relationships are defined as "franchises". With reference to this action, a "franchise" exists where there is: 1) a distribution of services associated with the franchisor's trademark, trade name, advertising or other commercial symbol; 2) significant control of, or significant assistance to the franchisee's business operation; and 3) required financial commitment by the franchisee to the franchisor. 16 C.F.R. § 436.2(a)(1)(i) and (a)(2). Certain continuing commercial relationships are exempted or excluded from the Rule's scope, but none apply to this case. 16 C.F.R. § 436.2(a)(3) and (a)(4). The arrangement between Air Brook and Morgan is a "franchise" under the Rule.
Pursuant to 16 C.F.R. § 436.1(a), an unfair or deceptive act or practice is committed by a franchisor if it fails to provide any prospective franchisee with a single written disclosure statement or prospectus which accurately, clearly and concisely discloses 20 categories of information relating to the franchisor's organization, operation, management, control and finances. This statement must be presented at the earlier of: (1) 10 days prior to the earlier of the execution of the franchise agreement or the payment of any consideration by the prospective franchisee on account of the franchise relationship [collectively referred to as the "time for making of disclosures," 16 C.F.R. § 436.2(g)] or (2) a face-to-face meeting between the prospective franchisee and the franchisor, its agents or representatives, for the purpose of discussing the sale or possible sale of a franchise [referred to as the first "personal meeting," 16 C.F.R. § 436.2(o).]
Air Brook did not provide Morgan with a Rule disclosure statement in the manner and within the time mandated. Air Brook's defense that it "substantially complied" with the Rule *102 is of no moment because the Rule requires full compliance with its basic minimum standards of commercial practice.
Further, under 16 C.F.R. § 436.2(b), a franchisor commits an unfair or deceptive practice if it makes any representations (oral, written or visual) to the prospective franchisee that state or imply a specific level of profits, income or other financial gain to accrue in the relationship without providing the prospective franchisee with an additional single written disclosure statement setting forth the material bases for the earnings claim. Air Brook made a written earnings claim to Morgan, but did not provide Morgan with the Rule's written earnings claim statement. Again, Air Brook's defense of "substantial compliance" is of no moment.
A franchisor's failure to comply with the Rule, such failure deemed by the Rule to be an unfair or deceptive act or practice, is an affirmative act or practice in violation of § 2 of the Act. The intent of the franchisor to deceive and the effects thereof are irrelevant inasmuch as intent and actual harm are not required to establish a prohibited act of commission under the Act. D'Ercole Sales, Inc. v. Fruehauf Corp., 206 N.J. Super. at 21, citing Fenwick v. Kay American Jeep, Inc., 72 N.J. 372, 377 (1977). As noted by the Supreme Court in Fenwick, it is "[t]he capacity to mislead [that] is the prime ingredient of deception or an unconscionable commercial practice." Id. at 378.
The determination of the court in Swiss v. Williams, 184 N.J. Super. 243 (Cty.D.Ct. 1982), although overruled on other grounds,[9] supports the position that failure to provide "a material fact", which is to be relied upon in connection with a sales transaction, constitutes an act of deception, fraud, false pretense, false promise, misrepresentation or unconscionable commercial *103 practice as proscribed by the Act. In Swiss, a door-to-door seller of storm windows and doors contracted to sell his merchandise to a homeowner without providing her with the required rescission rights notice under the Door-to-Door Home Repair Sales Act, N.J.S.A. 17:16C-95 et seq. The court concluded that the seller's failure to comply with the rescission rights notice requirement constituted not only a violation of that statute, 184 N.J. Super. at 250, but also constituted a prohibited unconscionable commercial practice under § 2 of the Act. Id. at 251. Moreover, the court noted the effect of an equally applicable Federal Trade Commission rescission rights notice requirement, 16 C.F.R. § 429.1, in its "conclusion that plaintiff violated the Consumer Fraud Act [by engaging in conduct deemed to be] an `unfair and deceptive act or practice'." Id. at 252.
Air Brook's failure to comply with the Rule's requirements in the sale of the franchise to Morgan constitutes a per se deceptive or unconscionable commercial act or practice in violation of § 2 of the Act. Its failure to accord Morgan the basic minimum protection afforded by the Rule is violative of the standard of commercial conduct established by and embodied in the Act. The antiquated rule of caveat emptor has no place in modern society, which demands disclosure, honesty and good faith. Air Brook's failure to comply with the Rule, regardless of its motives, is an unlawful act or practice under the Act.
Defendant's additional argument is that even if the Act does apply to a franchise transaction that plaintiff made up his mind to enter into the relationship prior to receiving the materials and therefore he could not have relied upon the materials in forming his decision to enter into the agreement. In light of the court's determination, this contention has no merit.

SUBSEQUENT MOTION BY AIR BROOK TO VACATE SUMMARY JUDGMENT DENIED.
After this Court granted summary judgment, Air Brook moved to vacate the judgment on Count One contending: (a) *104 that the Court is bound by an unreported opinion of the Division of Workers' Compensation (which was affirmed in an unreported per curiam opinion by the Appellate Division, from which certification was denied), which held that another employee of Air Brook was its "employee" for purposes of obtaining workers' compensation; and therefore, the relationship between Morgan and Air Brook is specifically excluded under 16 C.F.R. § 436.2(a)(4)(i); (b) a question of fact exists as to whether Air Brook is subject to the regulatory control of a federal or state agency; and (c) since the Franchise Practices Act does not mention advertisements and sales, the Court should not act as a Legislature to impose coverage under a separate statute.
Air Brook now seeks to set aside the ruling herein that the Federal Trade Commission Franchise and Business Opportunity Ventures Disclosure Rule, 16 C.F.R. § 436 ("Rule"), applies to Air Brook's method of promoting its business opportunities to the general public and inducing members of the general public to purchase an Air Brook franchise.
There is no dispute that there is an exclusion from the Rule's requirement that a franchisor provide a disclosure statement under 16 C.F.R. § 436.1(a), 16 C.F.R. § 436.8(a)(4)(i) for an "employer-employee relationship". 436.2(a)(4)(i). The fact that a Workers' Compensation judge, in an unpublished opinion, found Air Brook to be an employer under the Workers' Compensation Act, N.J.S.A. 34:15-36 et seq., and awarded compensation for work-related injuries to another Air Brook franchisee, has no bearing on this case which involves the Consumer Fraud Act and not the Workers' Compensation Act.
There can be no doubt that the purpose of the Workers' Compensation Act is far different from the purpose underlying the Rule and the Act. Further, the two distinct regulatory frameworks (protection against deception or misrepresentation in the promotion and sale of merchandise versus compensation for work-related injuries) are not incompatible. Indeed, the liberal construction of the Compensation Act and the broad *105 definition of "employee" enables a court to include "relationships not ordinarily considered to constitute employment [and] to bring as many cases as possible within [the Compensation Act's] coverage." New Jersey Property-Liability Ins. Guar. v. State, 195 N.J. Super. 4, 11 (App.Div. 1984) quoting Hannigan v. Goldfarb, 53 N.J. Super. 190, 195 (App.Div. 1958). This is so because the test for determining whether the employer-employee relationship exists looks to more than the control element of the master-servant relationship. Under the Compensation Act, the court looks to "the extent of the economic dependence of the worker upon the business he serves and the relationship of the nature of his work to the operation of that business." Id. at 10, quoting Marcus v. Eastern Agricultural Ass'n, Inc., 58 N.J. Super. 584, 603 (App.Div. 1959) (Conford, J.A.D. dissenting), rev'd on dissent 32 N.J. 460 (1960). This "relative nature of work" test is far broader than the ordinary master-servant "control test" in which the relationship exists "`whenever the employer retains the right to direct the manner in which the business shall be done, as well as the result to be accomplished, or in other words, not only what shall be done, but how it shall be done.'" Id. at 8, quoting Errickson v. Schwiers Co., 108 N.J.L. 481, 483 (E. & A. 1931). Thus, in New Jersey Property-Liability Ins. Guar. v. State, supra, the Appellate Division determined that the trial court had incorrectly applied the Compensation Act's "relative nature of work" test as a basis for concluding that foster parents were state "employees" under the New Jersey Tort Claims Act. N.J.S.A. 59:1-1 et seq.; Id. at 11.
In its interpretive guides, the FTC expressly declared that it "will apply the traditional test of `right of control' in determining whether an employment relationship exists...." 44 Fed. Reg. 49968 (1979). It further set forth certain illustrative guides:
whether a salary or a definite sum of money is given as consideration for the work, or whether the employee can be discharged or his employment terminated *106 without liability on the part of the principal, as well as ... whether the "employee" must invest money in the business before being "hired". [Ibid.]
In this action, the relationship between Morgan and Air Brook was not a "continuing commercial relationship created solely by... the relationship between an employer and an employee...." [16 C.F.R. § 436.2(a)(4)(i); emphasis supplied.] Indeed, the only continuing commercial relationship sought by Air Brook to be promoted and sold to members of the general public and to be created was one exclusively of a franchise nature. 16 C.F.R. § 436.2(a)(5). Air Brook cannot claim an exclusion from the Rule's coverage based upon an improper application of Compensation Act standards to Air Brook's promotion and sale practices. To hold otherwise would nullify the basic minimum protection afforded by the Rule.
In its Answer, Air Brook repeatedly refers to the solicitation and operation of a franchise. Air Brook's Counterclaim is based upon Morgan's alleged breach of the "franchise agreement." In its promotional materials, Air Brook extols the satisfaction "of being your own boss." Throughout its promotional "be your own boss" material, Air Brook refers to the responsibilities of its franchisees and specifically reinforces this theme by stating:
Each franchisee is an Independent Contractor and in business for himself. Air Brook does not tell you, nor attempt to tell you, how to run your business. The manner in which you, as an "Independent Contractor" conduct your business is entirely your decision, so long as you abide by all law ordinances. [Ibid.]
Moreover, Air Brook makes clear to those interested in purchasing a franchise that franchisees are responsible for computing, reporting and paying all income taxes and Social Security obligations for him/herself and any of his/her employees. Ibid. Finally, Article IV of Air Brook's "Independent Driver Agreement" specifically refers to Morgan's "Franchise Investment" of $7,000, consisting of a $2,000 "security deposit" and a $5,000 "franchise fee" in consideration of Air Brook's agreement to make a vehicle available to him.
*107 In sum, there is no genuine dispute regarding any material fact that Air Brook promotes the sale of its merchandise to the general public as a franchise relationship. Indeed, the totality of the contractual undertaking and the incidents thereof bespeak nothing less than a continuing commercial relationship subject to the protection afforded to the investing public by the Rule, and in default thereof, made cognizable as a violation of the Act.
The employer-employee exclusion from the Rule's protective sweep is not applicable to the promotion and sale of Air Brook's merchandise inasmuch as the continuing commercial relationship promoted, sold and created by Air Brook is inherently a franchise investment.
Air Brook now asserts that it is regulated by the Department of Transportation and the Interstate Commerce Commission, although it still submitted no competent proof to substantiate this contention. R. 1:6-6. The agencies it cites may regulate fares, tariffs, safety, hours, lanes of pick-up and the need for insurance, but nowhere do they regulate the sale of franchises or admission to operate, as the professions are regulated. The operator of a limousine who purchases the right to operate under the Air Brook banner does not learn any facts about the business from the ICC, DOT, PUC or anyone else but Air Brook. Neither do these agencies have any jurisdiction over disputes between franchisors and franchisees regarding their relationship.
Air Brook's last argument is that this Court's decision should not apply retroactively because it would be unfair and also grant all operators from Air Brook an immediate cause of action. It further contends that it justifiably relied upon an unreported Workers' Compensation opinion.
It is well established that "[t]he threshold inquiry in any retroactivity decision is whether a new rule of law has actually been announced." Rutherford Educ. Ass'n v. Bd. of Educ., 99 N.J. 8, 21 (1985). Consequently, "retroactivity can *108 arise only where there has been a departure from existing law." State v. Burstein, 85 N.J. 394, 403 (1981). Merely because this Court has determined that the failure to provide a prospective franchisee with a Rule disclosure statement constitutes a per se prohibited deceptive or unconscionable commercial act or practice under § 2 of the Act does not constitute a new rule of law or a departure from existing law. Indeed, given the prior application of a similar FTC disclosure requirement in connection with door-to-door sales, 16 C.F.R. § 429.1, as the basis for the conclusion that the failure to provide disclosure is a per se deceptive or unconscionable commercial act or practice in violation of § 2 of the Act, Swiss v. Williams, 184 N.J. Super. 243, 251 (Cty, D.Ct. 1982), which holding was expressly overruled in Skeer v. EMK Motors, Inc., 187 N.J. Super. 465, 473 (App.Div. 1982), this Court merely applied existing law to the promotion and sale of merchandise by Air Brook.
Even if this Court had concluded that its Order amounts to a new rule of law or departs from existing law, Air Brook presents no sound reason to confine the Order to prospective application. Its alleged reliance upon the unreported opinion is misplaced. Further, Air Brook's "reliance" argument regarding the exclusion of its business from the reach of the Rule was raised and rejected in a similar context by the Appellate Division in Levin v. Lewis, 179 N.J. Super. 193 (App.Div. 1981). In Lewis, the owner of a business involving the restoration of antique cars argued that his business was not encompassed by the laws governing automotive repairs. N.J.A.C. 13:45A-7.1 et seq. He further argued that, if his business be found to fall within those laws, the application be made prospective only. In rejecting both arguments and affirming the administrative order below, the Court determined that a retroactive application was justified since "appellant should not have reasonably assumed that his business was exempt. Rather, a more reasonable approach would have been to assume that he was included within the ambit of the regulation." Id. at 202.
*109 There is nothing in the record to indicate that Air Brook had any reasonable ground to assume that the promotion and sale of its merchandise to the general public was outside the scope of the Rule. Air Brook's contention, first raised upon its motion to vacate the summary judgment, of reliance upon an unreported opinion in a Workers' Compensation case, does not create the type of reasonable reliance sufficient to rebut the presumption in favor of retroactivity. Rutherford Educ. Ass'n v. Bd. of Educ., 99 N.J. at 21.
Prospective application usually arises when the Court is reversing existing law, as in Merenoff v. Merenoff, 76 N.J. 535 (1978), which eliminated interspousal immunity as a defense.
The Consumer Fraud Act was in place prior to Air Brook's decision to sell franchises in New Jersey without providing anything but misleading data. It should have known that prospective purchasers, particularly those not sophisticated in business matters, would rely upon what it furnished to them.
Air Brook does not seek to have this judgment in favor of plaintiff applied prospectively, but rather, the effect of it on all its other franchisees. Even if this Court had authority to do so, no sound reason has been advanced for so doing.

CONCLUSION
Therefore, the transaction between Air Brook and Morgan is within the protective sweep of the Act, the sale of the franchise by Air Brook to Morgan is "merchandise" within the intendment of the Act and Air Brook's failure to provide Morgan with the Rule disclosure statement is a per se prohibited act of commission under § 2 of the Act.
Summary judgment is granted in favor of plaintiff on the First Count that defendant violated the Act. Summary judgment is granted to defendant dismissing the Third and Fourth Counts of the complaint.
*110 Since Morgan did not submit any proof as to damages arising out of Air Brook's violation of the Act, that issue must be decided at a future hearing.
NOTES
[1] The actual title of the Act when it was originally adopted was: "An Act concerning consumer fraud, its prevention, and providing penalties therefor." L. 1960, c. 39, p. 137.
[2] A detailed reading of § 2 illustrates that the defined term "person" is used to refer to both parties to the sale. Absent a "clear indication to the contrary [the repetition of the defined term "person"] should have the same meaning throughout." Keith Mach. Corp. v. S. Plainfield, 89 N.J. Super. 584, 591 (Law Div. 1965).
[3] Indeed, at the time of enactment of § 22 of the Act, L. 1975, c. 242, § 2 was amended, L. 1975, c. 294, § 1, but the definitions contained within § 1 were not changed.
[4] The court in Catanella also held that "securities" were not merchandise within the intendment of the Act because "securities" had been considered by the Legislature for inclusion in § 1's definition of merchandise and because such inclusion was not part of the legislation as enacted. 583 F. Supp. at 1441.
[5] Although various states have enacted franchise and business opportunity disclosure statutes which set up a comprehensive regulatory scheme for supervision and control of such business activities, see e.g., Cal.Corp.Code, § 31000 et seq. (franchises), Cal.Civ.Code, § 1812.200 et seq. (seller assisted marketing plans), New Jersey has no such scheme. This is all the more reason, if one is needed, for subjecting franchise or business opportunity sales and advertisements to the Act.
[6] The actual title of this Act when it was adopted was: "An Act to prohibit unfair practices in franchising and supplementing Title 56 of the Revised Statutes." L. 1971, c. 356.
[7] The FPA does not apply to this matter inasmuch as one of the two conditions for application has not been met: namely, the lack of gross sales of products or services between Air Brook and Morgan having a value in excess of $35,000 for the 12-month period immediately preceding the filing of suit. N.J.S.A. 56:10-4(2). Reference to this legislation is for the purpose of defining the elements of a franchise and for the purpose of illustrating the similarity between New Jersey's construction of a franchise and the Rule's construction of a franchise.
[8] Illinois' definition of "merchandise" differs only in the following manner from § 1(c) of the Act: first, it includes intangibles and restricts real estate to that situated outside of Illinois; second, it does not include the phrase "anything offered, directly or indirectly, to the public for sale." For the most part, Illinois' definition of the elements of unlawful practices under its Consumer Fraud Act substantially parallel the provisions of § 2 of the Act. People ex. rel. Scott v. Cardet International, Inc., 321 N.E.2d at 390.
[9] Skeer v. EMK Motors, Inc., 187 N.J. Super. 465, 473 (App.Div. 1982) (court found that the trial court erred in its failure to award treble damages and attorneys' fees in private action under the Act.)