146 N.J. Super. 210 (1976)
369 A.2d 541
FINLAY & ASSOCIATES, INC., A NEW JERSEY CORPORATION, PLAINTIFF,
v.
BORG-WARNER CORPORATION, A DELAWARE CORPORATION AUTHORIZED TO DO BUSINESS IN THE STATE OF NEW JERSEY, AND TEK-BEARING CO., INC., DEFENDANTS.
Superior Court of New Jersey, Law Division.
Decided September 22, 1976.
*214 Gary S. Stein, for plaintiff (Messrs. Stein and Kurland, attorneys).
Michael M. Rosenbaum for defendant, Borg-Warner Corporation (Budd, Larner, Kent, Gross, Picillo and Rosenbaum, attorneys).
Charles M. James, for defendant Tek-Bearing Co., Inc. (Messrs. James and Addas, attorneys).
PETRELLA, J.S.C.
Plaintiff, a distributor terminated by defendant Borg-Warner Corporation, claimed the termination of its distributorship was wrongful, alleging applicability and violation of the New Jersey Franchise Practices Act (first count). It also seeks damages, including treble damages, for alleged violations of the New Jersey Antitrust Act and conspiracy to violate it.
The last sentence of plaintiff's pretrial contentions refers to a possible tort claim, although paragraph 7 of the pretrial order includes no such issue. See R. 4:25. At commencement of trial the parties agreed (despite a jury demand[1] of *215 the added second defendant, Tek-Bearing Co., in response to the amended complaint against it on a conspiracy theory) that there was no right to a jury under the New Jersey Franchise Practices Act. The entire case as to that act was heard by the court without a jury. Because of the apparent inclusion of a tort claim a jury was impanelled as to any alleged tort of interference with economic advantage or contractual relations, and subject to any further determination as to the propriety of a jury in a ruling at the end of the case, the alleged Antitrust Act violations were presented before the jury.

I. Franchise Practices Aspect
Plaintiff Finlay and Associates, Inc. entered into a written distributorship agreement dated October 11, 1968 with Morse Chain, Inc., predecessor to defendant Borg-Warner. The New Jersey Franchise Practices Act, N.J.S.A. 56:10-1 et seq., adopted as L. 1971, c. 356, effective December 21, 1971, applies to franchises created or renewed or amended after the effective date. See N.J.S.A. 56:10-8. In this case there is no written amendment to the distributorship agreement. Nevertheless, plaintiff alleges that the act applies by virtue of certain alleged additions or withdrawals of product lines specifically listed in that agreement and which it claims occurred after the effective date, and thus should be treated as amendments to the distributorship agreement *216 to bring it within the statute's coverage. Under N.J.S.A. 56:10-5, if the act applies, a franchisee can be terminated only in accordance with the act, and on notice and for good cause. "Franchise" is defined in N.J.S.A. 56:10-3(a):
"Franchise" means a written arrangement for a definite or indefinite period, in which a person grants to another person a license to use, a trade name, trade mark, service mark, or related characteristics, and in which there is a community of interest in the marketing of goods or services at wholesale, retail, by lease, agreement or otherwise. [Emphasis added]
N.J.S.A. 56:10-4 spells out "franchises," as defined, to which the act is applicable. Thus, gross sales of products between the franchisor and the franchisee covered by such franchise must exceed $35,000 for the 12 months before suit, and more than 20% of the franchisee's gross sales must be intended to be or are derived from the franchise. These two conditions were satisfied in this case. The third element is that performance contemplates or requires the franchisee "to establish or maintain a place of business within the State of New Jersey." The term "place of business" means, according to N.J.S.A. 56:10-3(f), a fixed geographical location, other than an office or warehouse or the like. The testimony that was credible indicated that plaintiff's business consisted of an office and warehouse operation from which incidental sales and pickups were made. Plaintiff's description was in large respect undermined by photographs of the interior. Nevertheless, it is clear that sales can be made from a warehouse.
The court considered various questions in this case. Is the definition of a franchise met? Was there a license granted? Was there a requirement of a "fixed geographical location" within this State in the agreement or contemplated thereby? Was there anything besides an office and warehouse maintained by plaintiff in this State? In considering this matter and making findings the court has determined that there is a fatal defect as a matter of law, as well as *217 certain omitted factual requirements, which negate plaintiffs being within the ambit of the Franchise Practices Act. There is no meeting of the statute's definition of franchise.
There is no written agreement granting a "license" to plaintiff from defendant Borg-Warner Corporation to "use" anything.
The court finds that the alleged additions to the product lines were all made available or available to plaintiff prior to the effective date of the Franchise Practices Act, and this was confirmed by defendant Borg-Warner's computer lists of products actually purchased by plaintiff on dates prior to the effective date of the Franchise Practices Act. The same applied to deletions. See Sears, Roebuck & Co. v. Merla, 142 N.J. Super. 205 (App. Div. 1976). Thus, there was no applicability of the act to the pre-existing distributorship agreement. This would resolve the issue, but the court will discuss other aspects which also preclude applicability of the act here.
There is no requirement in the written distributorship agreement, and no understanding between the parties in this case, which contemplates that plaintiff must maintain a fixed place of business within this State or at any specified geographical location. Plaintiff had a nonexclusive distributorship as to territory, area, product or competition. Plaintiff's president testified that his business made sales all over the State, although concededly primarily in the Northern New Jersey areas, as well as in Pennsylvania, New York, Maryland and other states.
Plaintiff's testimony was that no controls were placed on it in manner of operation or sales, or specific location. Even customers were not limited, subject possibly to qualification as to original equipment manufacturers. Plaintiff's president did indicate his belief that the North Jersey or Emerson area was the contemplated location. Plaintiff was not limited to any fixed geographical location. Compare, Business Incentives Co. v. Sony Corp. of America, 397 F. Supp. 63 (S.D.N.Y. 1975).
*218 In a broad sense, any arrangement between a manufacturer and seller or distributor or retailer to sell a brandname product could be considered a franchise. However, merely because there is a sale or distribution agreement does not make it a franchise within the purview of the act. The specific requirements of the act must be met.
Plaintiff seeks the legislative history of the Franchise Practices Act by looking to a statement by the chairman of the Assembly Judiciary Committee. Such a statement can be used as a basis for determining legislative history. See Raybestos-Manhattan, Inc. v. Glaser, 144 N.J. Super. 152, 168-171 (Ch. Div. 1976), and Caldwell v. Rochelle Park Tp., 135 N.J. Super. 66, 74 (Law Div. 1975). However, this statement was in opposition to the bill (Assembly Bill 3063 of 1971), and was addressed to the version of the bill before it was amended. The committee chairman had noted that § 3(a) of the bill, as then written, encompassed written or oral agreements. The chairman was speaking primarily of "exclusive" distributorships, as well as the type of franchise which is not involved in this case which included franchising of an entire business system. The legislation as enacted was limited to written agreements. The scope of the bill was narrowed, and thus that statement is of little aid here to plaintiff.
Plaintiff, as part of its sales of products, could give out or had available certain catalogs which listed or advertised Borg-Warner's products, and plaintiff could, if it wished, have its business name imprinted thereon by it or defendant Borg-Warner, or by plaintiff affixing its labels or even by its own rubber stamp. In addition, plaintiff argued that by its being furnished items such as rolls of adhesive wrapping or label tape which had advertising of the Borg-Warner name, and obtaining match books and similar advertising materials on which it could also have its name imprinted along with Borg-Warner, this constituted such a license to use Borg-Warner's name as to bring it within the Franchise Practices Act.
*219 Mere furnishing of advertising materials as contemplated by the distributorship agreement, and allowing plaintiff to have its name placed on certain items, if it wished, as advertising (plaintiff using its own business name) for their own benefit does not fulfill the letter or intent of the Franchise Practices Act. Obviously, someone who sells a product has to, or wants to, make known that he has it. Distributing advertising materials of another's products, with or without plaintiff's name, or having those materials available, including catalogs, or participating in advertising or listing advertisements that certain individuals or businesses sell certain products, is not what is meant by a license to use the various items referred to in the statute. The agreement here merely provided that the manufacturer would make advertising material available. Although "license" is not expressly defined in the statute, it is a familiar word in the law and can be used in different senses. See Black's Law Dictionary. The question is, what does it mean in the context of the Franchise Practices Act? Although the word "license" has many applications, it means in this statute to use as if it is one's own. It implies a proprietary interest and this is what the Legislature intended in effect. Mere oral permission would not be enough under the statute.
The trademark, tradename reference means and implies use of that name in the very business title of the franchisee and a holding out or perhaps representation to the public of some special relationship or connection. Simply selling goods or distributing materials which bear the manufacturer's name or trademark does not "license" use of the "trademark." See Note, 48 Wash. L. Rev. 291 (1973). Nor is the common interest in selling a product and making a profit sufficient. The occasional repairs or incidental services performed on defendant's products by plaintiff, which it claimed other distributors were not authorized to perform, were of an inconsequential nature and do not change the situation.
The term "grant" is a familiar one in property law and relates to the requirement of a writing. There is no *220 license granted here to use a tradename or a trademark, service mark or related characteristic, for either a definite or indefinite period of time. The reference to "related characteristic" in the statute can refer to such things as symbols and physical objects. See Susser v. Carvel Corp., 206 F. Supp. 636 (S.D.N.Y. 1962), aff'd 332 F.2d 505 (2 Cir.1964), cert. granted, but later dismissed at 381 U.S. 125, 85 S.Ct. 1364, 14 L.Ed.2d 284 (1965).
The court has reviewed the purposes of the Franchise Practices Act and notes that it lists certain prohibited acts in N.J.S.A. 56:10-7, to afford protection against arbitrary cancellation of affected franchises and to deal with certain economic coercion. See Amerada Hess Corp. v. Quinn, 143 N.J. Super. 237, 251 (Law Div. 1976).
Plaintiff was able to continue its business under its own name and has done so without interruption since termination of the distributorship as of June 11, 1974. There was no impact due solely to inability to use a trade name or trademark in its business or any of the other elements referred to in the statute, as opposed to selling a particular manufacturer's product. There is a difference in product line able to be distributed insofar as it does not include defendant's. However, from the proofs it is clear that other manufacturers also make available comparable products.
As to the intent to cover situations such as the distributorship here, the court notes that although there is an agreement called "Distributorship Agreement," in the present case there is no requirement for economic dependency except to the extent plaintiff by its own choice elected to concentrate on the line of merchandise it preferred for whatever business reasons, including profit motive. Here, plaintiff's business does not operate under the name of any "franchisor," but under the name "Finlay & Associates, Inc.," its own name.
Plaintiff relies on Shell Oil Co. v. Marinello, 120 N.J. Super. 357 (Ch. Div. 1972), mod., 63 N.J. 402 (1972). This case is clearly distinguishable. There the lease and distributorship were part of an integrated business relationship *221 and Shell Oil Company controlled all aspects of the business. It had the absolute right to terminate the lease on ten days' notice without any reason, and furthermore, N.J.S.A. 56:6-19(c) was found to be another policy reason for not allowing termination of the franchise. The Supreme Court in Marinello recognized that although the Franchise Practices Act did not control the situation before it, other reasons prevented termination of that franchise.
Plaintiff has failed to prove a case under the Franchise Practices Act[2] and the complaint as to this aspect is in all respects dismissed with prejudice and without costs.

II Anti-trust aspect
At the close of plaintiff's case as to alleged violation of the New Jersey Antitrust Act, conspiracy to violate that Antitrust Act, and an alleged tort of interference with contractual relations or with economic advantage, the court granted defendants' motions for involuntary dismissal. Plaintiff had called defendants' witnesses on its case, so that in one sense more than just plaintiff's side of the case was presented. All reasonable inferences were given in favor of the party opposing the motions. Dolson v. Anastasia, 55 N.J. 2 (1969).
Plaintiff alleged violations of N.J.S.A. 56:9-3 and 4 (sections of the New Jersey Antitrust Act, L. 1970, c. 73, effective May 21, 1970). These sections are modelled after the federal Sherman Antitrust Act[3], and provide:
3. Every contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade in this State, shall be unlawful.
*222 4. It shall be unlawful for any person to monopolize, or attempt to monopolize, or to combine or conspire with any person or persons, to monopolize trade or commerce in any relevant market within this State.
New Jersey precedent is sparse, and so is federal precedent under the factual circumstances presented. Although § 18 requires the statute to be construed in harmony with ruling judicial interpretations of comparable federal antitrust statutes, what constitutes ruling judicial interpretations in various situations under comparable federal antitrust statutes is open to debate, absent a United States Supreme Court decision, especially when there is no clear determination, or when there are conflicts between decisions in different Circuit Courts of Appeal. Under federal law even courts of coequal jurisdiction have come to inconsistent results on similar, and indeed more extreme facts.
It is alleged that defendant Borg-Warner conspired with one of plaintiff's competitors, defendant Tek-Bearing, to drive plaintiff out of the market. Basically, this is a dispute between a manufacturer and a terminated distributor. The proofs were to the effect that Tek-Bearing was unhappy or dissatisfied with the establishment or granting of another distributorship or franchise by Borg-Warner in North Jersey to a distributor who operated for years in the New Jersey shore area out of Point Pleasant.
Federal cases indicate that not all restraints of trade are impermissible. Only contracts or combinations which are unreasonably or unduly in restraint of trade are prohibited. See, for example, White Motor Co. v. U.S., 372 U.S. 253, 83 S.Ct. 696, 9 L.Ed.2d, 738 (1963), and Standard Oil Co. v. United States, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911). Unless there is a "per se" violation, as discussed hereinafter, only unreasonable restraints of trade are proscribed. In this case the evidence is clear and undisputed that there is no exclusive contract as to territory, product or anything else. There is no claim that plaintiff was put out of business or that that was the main *223 purpose of what is alleged to have occurred. There is no claim of any illegal boycott and no proof of that in the case for any factfinder to resolve.
Under the common law a manufacturer has a monopoly to sell his product, especially under his own name. Federal Antitrust Laws have not destroyed that right. See Schwing Motor Co. v. Hudson Sales Corp., 138 F. Supp. 899 (D. Md.), aff'd 239 F.2d 176 (4 Cir.1956), cert. den. 355 U.S. 823, 78 S.Ct. 30, 2 L.Ed.2d 38 (1957). In this court's view the same reasoning applies to the New Jersey Antitrust Law.
The general principals which control these cases have been frequently stated, and may be briefly summarized. Every manufacturer has a natural and complete monopoly of his particular product, especially when sold under his own private brand or trade name. [citations omitted]
If he is engaged in a private business, he is free to exploit this monopoly by selling his product directly to the ultimate consumer or through one or more distributors or dealers, as he may deem most profitable to him. If he chooses the latter method, he may exercise his own independent discretion as to the parties with whom he will deal. This is a common law right which the antitrust laws have not destroyed. [Citations omitted]
A refusal to deal becomes illegal only when it produces an unreasonable restraint of trade or a monopoly forbidden by the antitrust laws. [Citations omitted]
A manufacturer may prefer to deal with one person rather than another, and may grant exclusive contracts in a particular territory. [Citations omitted]
Unless his contract so provides, a dealer once appointed has no tenure, no right to a renewal of his contract. [Citations omitted] [138 F. Supp. at 903]
The case discusses the inherent monopoly aspect, but indicates that such a monopoly is not prohibited unless it is an illegal per se violation.
Public injury alone justifies the three-fold increase in damages. It is essential, therefore, that the complaint allege facts from which it can be determined that the conduct charged to be in violation of the anti-trust laws was reasonably calculated to prejudice the public interest by unduly restricting the free flow of interstate commerce. [138 F. Supp. at 903] *224 In the instant case the court emphasizes that there has been a lack of any proof here of prejudice to the public interest.
Under federal statutes and case law it is not a per se violation for a manufacturer to grant a distributor an exclusive contract. Lacking unfair, unreasonable or monopolistic conduct, a manufacturer or a distributor or franchisor is permitted to deal with some distributors or franchisees or distributees and refuse to deal with others. Subject to requirements of good faith dealing, it is permissible for a manufacturer or a distributor to drop those franchisees whose performance is deemed unsatisfactory. It is recognized that federal cases have dealt primarily with exclusive distributorships, and this aspect will be further emphasized in the context of this case. See cases such as United States v. Parke, Davis & Co., 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960); Times-Picayune Pub. Co. v. United States, 345 U.S. 594, 73 S.Ct. 872, 97 L.Ed. 1277 (1953); United States v. Bausch & Lomb Optical Co., 321 U.S. 707, 64 S.Ct. 805, 88 L.Ed. 1024 (1944); Schwing Motor Co. v. Hudson Sales Corp., supra; Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd., 416 F.2d 71 (9 Cir.1969), cert. den. 396 U.S. 1062, 90 S.Ct. 752, 24 L.Ed.2d 755, reh. den. 397 U.S. 1003, 90 S.Ct. 1113, 25 L.Ed.2d 415 (1970); and Ricchetti v. Meister Brau, Inc., 431 F.2d 1211 (9 Cir.1970), cert. den. 401 U.S. 939, 91 S.Ct. 934, 28 L.Ed.2d 219 (1971).
The court emphasizes that the distributorship arrangement here is undisputedly and clearly nonexclusive as to product or territory. The parties to the agreement had an equal right of conducting their business in an appropriate manner and of cancelling on 60 days' notice in accordance with the terms thereof, unless precluded by some other requirement.
There are exceptions to the application of the so-called "rule of reason" which have been considered under federal case law to have such a conclusively detrimental effect on competition that they are presumed to be "per se" *225 violations of federal antitrust laws. Such arrangements include price-fixing, division of markets among competitors, tying arrangements and boycotts.
The federal cases refer generally to three categories of per se violations. The first is a horizontal combination among traders at one level of distribution whose purpose is to exclude competition from the market. See Eastern States Retail Lumber Dealers' Ass'n. v. United States, 234 U.S. 600, 34 S.Ct. 951, 58 L.Ed. 1490 (1914), and Associated Press v. United States, 326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed. 2013 (1945). A second category is a vertical combination among traders at different marketing levels, designed specifically to exclude from the market direct competitors of some members of the combination. See Klor's, Inc. v. Broadway-Hale Stores, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959). The third would be a combination designed to influence coercively trade practices of boycott victims rather than to eliminate them as competitors. See, for example, Fashion Originators' Guild of America v. F.T.C., 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949 (1941).
As stated in E.A. McQuade Tours, Inc. v. Consolidated Air Tour Manual Committee, 467 F.2d 178, 187 (5 Cir.1972), cert. den. 409 U.S. 1109, 93 S.Ct. 912, 34 L.Ed.2d 690 (1973):
* * * In all of these cases the touchstone of per se illegality has been the purpose and effect of the arrangement in question. Where exclusionary or coercive conduct has been present, the arrangements have been viewed as `naked restraints of trade,' and have fallen victims to the per se rule. On the other hand, where these elements have been missing, the per se rule has not been applied to collective refusals to deal. [at 187]
Compare Joseph E. Seagrams & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd., supra.
Indeed, when a distributor is replaced by another distributor, the federal cases indicate that if the public is *226 given a comparable substitute, i.e., there is no diminution in the number of distributors or outlets offering services, this does not constitute a violation. See Industrial Building Materials, Inc. v. Interchemical Corp., 437 F.2d 1336, 1342-3 (9 Cir.1971). Here, there is no proof of any real reduction in the number of outlets or distributors. There has been no diminution of total sales outlets in view of the opening of the new branch,[4] nor did the manufacturer enter the field and remove an independent distributor. There is no dispute as to that. Nor is there competent proof such as would lead a finder of fact to infer or find that the manufacturer had a dominant market position by means of any conspiracy or unfair tactics. Expressions of dissatisfaction are not enough to establish a conspiracy, let alone one in violation of the New Jersey Antitrust Act. The proofs in this case are based solely on inferences upon inferences, if that would be permissible. The conversation in a diner concerning alleged statements of a Mr. Sabitino (a Borg-Warner salesman) of "pressure" from an unknown source to eliminate an unnamed area distributor does not establish a conspiracy, even if taken into account with the other proofs. Nor is testimony about Tek-Bearing considering putting on another line (which it did not obtain) sufficient, either separately or combined with internal deliberations by Borg-Warner of possible termination of Central Engineering, and a memorandum by an employee of Borg-Warner listing numerous reasons for plaintiff's termination, but concluding: "As you know I owe one for the Trans-Nutley franchise for Tek, etc." The quoted language, although vague, may provide an additional reason for termination in light of the unhappiness over increasing the number of distributorship outlets, but hardly rises to a *227 level from which reasonable inferences could be drawn that would make Tek-Bearing a conspirator.[5]
The evidence presented is inadequate as a matter of law, and even for reasonable men to tie in defendant Tek-Bearing to any conspiracy, even recognizing the difficulty of proof of conspiracy and the necessity to rely on circumstantial evidence.
Plaintiff argued that the manufacturer's direct sales constituted competition on the same level with distributors sufficient to create a per se violation as to such items, and to this extent should be considered a horizontal combination. But, any original equipment manufacturer sale ("O.E.M.") by defendant Borg-Warner was obviously in the contemplation of the parties when the distributorship agreement was signed. The Klor's case is not persuasive or controlling here since it involved a prohibited boycott, and the intent was to prevent any dealings with Klors by various distributors and manufacturers. Most, if not all of the cases cited by plaintiff involved exclusive distributorships and attempts to actually drive a competitor out of business. As to the O.E.M. sales, defendant always competed on O.E.M. sales and reserved this area unto itself. It did, of course, allow certain sales to be made on application in effect giving up its own sales in that area and this was part of the understanding or agreement between the parties. There are no proofs of its unreasonableness.[6]
In the court's view there is no case that goes as far as plaintiff's counsel has asked this court to go in interpreting a relatively new law in New Jersey, as to which there is no guidance from any New Jersey appellate court, to find *228 a sufficient prima facie case to allow a factfinder to consider whether a violation has been established. The court has considered whether there would be a horizontal conspiracy violation based on the plaintiff's proofs, giving it all reasonable inferences. The court finds there is no basis to apply the per se violation rule. A proscribed horizontal combination has not been established either in fact or in law. It would appear an unreasonable rule to hold that distributors could not be unhappy, could not complain or protest the adding of new distributors in the general area, etc., without it becoming an illegal act or conspiracy. Obviously, they are free to seek substitute product lines of competitors. The proofs show no more than this. Under federal cases one can even seek an exclusive distributorship which would result in cancelling distributorships held by others. See Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd., supra; Schwing Motor Co. v. Hudson Sales Corp., supra; and Mogul v. General Motors Corp., 391 F. Supp. 1305 (E.D. Pa. 1975), aff'd 527 F.2d 645 (3d Cir.1976). This is what happened in Packard Motor Car Co. v. Webster Motor Car Co., 100 U.S. App. D.C. 161, 243 F.2d 418 (D.C. Cir.), cert. den. 355 U.S. 822, 78 S.Ct. 29, 2 L.Ed.2d 38, reh. den., 355 U.S. 900, 78 S.Ct. 259, 2 L.Ed.2d 197 (1957), motion for petition for second rehearing den., 357 U.S. 923, 78 S.Ct. 1358, 2 L.Ed.2d 1363 (1958), and absent a per se violation.
The court cannot find sufficient evidence from which it could be found that there has been a violation of the New Jersey Antitrust Act. Compare Ark Dental Supply Co. v. Cavitron, 461 F.2d 1093 (3 Cir.1972), where the parent and subsidiary had been accused of conspiracy to restrain trade by cancelling the distributorship. That decision rejected the contention that Schwinn or Klors governed that case and adopted for the Third Circuit the rule of reason discussed in Joseph E. Seagram & Sons, Inc. v. Hawaiian & Oke Liquors, Ltd., supra, and limited the per se rule. *229 See Barber, "Refusal to Deal Under the Federal Antitrust Laws," 103 U. Pa. L. Rev. 847 (1955) (quoted in the Seagram case, 416 F.2d at 77):
There are many "normal and usual agreements in aid of trade and commerce," * * * which involve the acceptance by the parties of limitations on their freedom individually to deal with others. * * * Requirements contracts, exclusive dealing contracts and contracts involving exclusive territories all involve limitations of the freedom of one or more of the parties to do business with others. * * *
Because all of the situations involve an agreement between two or more persons under which one or more of them agree not to deal with third persons and for that reason foreclose a part of the market to such third persons, they are all subject to scrutiny under the antitrust laws. But in the ordinary case these do not involve combining for the primary purpose of coercing or excluding; rather they involve combinations of two or more persons to further directly the business of the parties to the agreement, and the effect on third parties and on competition is indirect. [416 F.2d at 77]
In Ricchetti v. Meister Brau, Inc., supra, the court said:
It is well established that a manufacturer or producer has the right to deal with whom he pleases and to select his customers at will, so long as there is no resultant effect which is violative of the antitrust laws. Thus, a manufacturer may discontinue a relationship, or refuse to open a new relationship for business reasons which are sufficient to the manufacturer, and adverse effect on the business of the distributor is immaterial in the absence of any arrangement restraining trade or competition. [431 F.2d at 1214; citations omitted]
In the present case there is no evidence submitted to meet the test of harm to the trade in the area, to competition, or to the general public as a result of Borg-Warner's termination of plaintiff. The effect on the individual supplier is not enough. See Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd. supra; Hub Auto Supply, Inc. v. Automatic Radio Mfg. Co., 173 F. Supp. 396 (D. Mass. 1959).
Since it is not a violation of federal law for a distributor to seek and obtain cancellation of other distributors and be given an exclusive distributorship, then where there *230 is no exclusive distributorship there can be no violation even for complaints which bring about a balancing reduction in the number of distributors in the area when a new one is added. Even a conspiracy allegation has to be evaluated in light of the cases and a rule of reason approach applied under the circumstances here. Reasonable men could not find any proofs of predatory intent or of conspiracy. Likewise, there is no adequate proof to create a fact question as to any combination or conspiracy to monopolize or otherwise violate the act. See United States v. E.I. Du Pont De Nemours, 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264 (1956); United States v. Grinnell Corp., 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966); Mogul v. General Motors Corp., supra.
Accordingly, the complaint, as amended as to violation of the New Jersey Antitrust Act and conspiracy to violate the act, is dismissed, with prejudice and without costs.

III
The only remaining issue is the possible claim of unlawful interference with economic advantage or with contractual relations. Since defendant Borg-Warner could under the circumstances terminate plaintiff's distributorship, any such tort claim could only be against defendant Tek-Bearing. However, the evidence on this point, being basically the same as in the conspiracy issue, is likewise insufficient as a matter of law.
Accordingly, the complaint (as amended), and all cross-claims are dismissed, with prejudice and without costs.
NOTES
[1] The only jury demand by Tek-Bearing in its answer to the amended complaint was under the New Jersey Antitrust Act, and was presumably addressed to the conspiracy allegation. Federal cases under the Sherman Antitrust Act apparently allow a trial by jury under federal procedures, even though not provided for by statute, irrespective of whether the cause of action existed at common law. See, e.g., Beacon Theatres, Inc. v. Westover, 359 U.S. 500, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959). But compare Davis v. Marathon Oil Co., 57 F.R.D. 23 (N.D. Ohio 1972), where Judge Young reviewed the law and made a strong argument that juries should not be required in such cases. Indeed, summary judgment motions appear to be treated somewhat differently under the federal cases because of the complexity of antitrust cases. Compare Mogul v. General Motors Corp., 391 F. Supp. 1305, 1307 (E.D. Pa. 1975), aff'd 527 F.2d 645 (3 Cir.1976), with Schwing Motor Co. v. Hudson Sales Corp., 138 F. Supp. 899, 890 (D. Md. 1956), aff'd 239 F.2d 176 (4 Cir.1956), cert. den. 355 U.S. 823, 78 S.Ct. 30, 2 L.Ed.2d 38 (1957).
[2] Because of the failure of plaintiff's proofs the court need not determine whether Borg-Warner had just cause to terminate the distributorship because of reasons such as failure to maintain adequate stock, continual difficulties with payments and engaging in another business to the detriment of the distributorship.
[3] 15 U.S.C.A. §§ 1 and 2.
[4] Plaintiff's proofs were that one distributor was to be eliminated from the northern New Jersey area upon establishment of the new distributorship although plaintiff argued it was supposed to be or should have been other than it.
[5] The proofs referred to were offered and/or admitted only against Borg-Warner since the conspiracy had not been established.
[6] Indeed, a persuasive argument might be made as to the advantages of a product manufacturer encouraging equipment manufacturers to incorporate the former's product in equipment manufactured by them, with possible resultant benefits even to distributors.