**COLT INDUSTRIES, INC., Plaintiff,**

**v.**

**FIDELCO PUMP & COMPRESSOR CORP. and Fidelco Equipment Corporation, Defendants.**

Civ. A. No. 87–1347.

United States District Court, D. New Jersey.

May 29, 1987.

John J. Carlin, Jr., Florham Park, N.J., for plaintiff.

Budd, Larner, Gross, Picillo, Rosenbaum, Greenberg & Sade, P.C., Short Hills, N.J. by Michael M. Rosenbaum, for defendants.

## OPINION

BARRY, District Judge.

Plaintiff Colt Industries ("Colt") brings this action against defendants Fidelco Pump & Compressor Corporation (Fidelco–New Jersey) and Fidelco Equipment Corporation (Fidelco–Connecticut) (collectively "Fidelco") alleging the breach of an agreement to pay monthly charges arising from defendants' sale of plaintiff's products in New Jersey and Connecticut. Defendants, contending that two other separate agreements, one between Colt and Fidelco–New Jersey and one between Colt and Fidelco–Connecticut, constitute franchise agreements between the parties, now move for a preliminary injunction enjoining plaintiff's attempted termination of the latter two agreements as violative of New Jersey's Franchise Practices Act, N.J.Stat.Ann. 56:10–1 to –15 (West Cum.Supp.1986–87) and the Connecticut Franchise Act, Conn. Gen.Stat.Ann. § 42–133e to –133g (West 1987). The relief sought by defendants will be denied.

### Findings of Fact

1. Plaintiff, through its Quincy Compressor Division, manufactures and sells a line of compressors.

2. Defendants are branches of a large multi-state company that sells and services numerous brands of industrial pumps, compressors and similar products.

3. On December 12, 1985, Colt and Fidelco entered into an agreement in which Colt agreed a) to dismiss with prejudice a state court lawsuit against an entity known as the General Electrical Equipment Company ("General Electrical") and b) to appoint Fidelco as a distributor and "Authorized Warranty Service" in New Jersey and in Connecticut for Quincy products, in exchange for Fidelco's promise to assume General Electrical's debt to Colt. The total amount due Colt from General Electrical— $87,588.85—was to be paid by Fidelco overpaying by 5% on invoices of Quincy products. Any balance remaining at the end of a one-year period was to paid in a lump sum. Pursuant to this agreement, certain unnamed representatives of Colt visited Fidelco's Newark, New Jersey facility and insisted that the facility be upgraded to adequately display and service Quincy products.

4. On January 15, 1986, plaintiff and the defendant Fidelco–New Jersey entered into a non-exclusive "Distributor Agreement" granting Fidelco–New Jersey the right to sell Quincy products in Northern New Jersey. On the same day, plaintiff and defendant Fidelco–Connecticut entered into an identical nonexclusive agreement granting Fidelco–Connecticut a distributorship for the sale of Quincy compressors in Connecticut. There is no specific reference in either of these two agreements to "Authorized Warranty Service."

5. The agreements were to expire at the end of one year and in fact did expire at the end of that term. An additional renewal term of one year could have been entered into "by the mutual written consent of the parties." Although this provision was not exercised, the parties have continued their business relationship without the benefit of a written agreement on an *ad hoc* basis to this date. On their face, the agreements may be terminated without cause by either party upon sixty days notice.

6. The agreements grant defendants the right to display the Quincy trademark, in a manner consistent with Quincy's advertising policies, in conjunction with advertising the product and identifying Fidelco as a "distributor," but prohibit use of the Quincy mark "as part of [the] Distributor's business name."

7. The agreements require the defendants to establish and maintain an "aggressive sales effort." According to the agreement "[t]his includes advertising, stocking of Quincy Compressors and genuine Quincy replacement parts and accessories." In

addition, the parties are called upon to arrive at "mutually agreed upon sales goals." Plaintiff exercises no control over the training, hiring, number, or qualifications of Fidelco employees. Plaintiff exercises no control over the management of Fidelco, does not train its managers, does not prescribe the hours of operation, or—other than suggesting list prices—in any manner set the price for the sale of its compressors by Fidelco. Other than the shared interest in the sale of Quincy products, the parties have no financial interest in the affairs of the other.

8. During the course of the relationship between the parties they engaged in a cooperative sales program in which a) they jointly paid for Fidelco advertisements in the "yellow pages" listing Fidelco as a Quincy distributor and service center, b) Quincy representatives conducted sales meetings at the Fidelco facilities in which new products were introduced, technical questions answered, and product differences explained, c) Quincy provided sales incentives to Fidelco salesmen and distributed a news letter designed to promote Quincy products and motivate sales, d) Quincy suggested ways of directly soliciting customers by mail, and e) Quincy representatives would call on Fidelco customers in an effort to help close sales and would at times agree to lower prices to that end.

9. The agreements acknowledge Fidelco's status as an independent agent without the actual or implied power to bind plaintiff.

10. The agreements call for shipment of goods f.o.b. factory, invoiced and billed under "the terms in effect at the time of the shipment." Plaintiff reserves the right to receive satisfactory evidence of defendants' financial responsibility not less than once a year. Goods can be returned for credit but only after prior written permission.

11. During the twelve months directly preceding the filing of this suit, defendants purchased more than $35,000.00 in goods and services from plaintiff.

12. In identical letters dated March 26, 1987, plaintiff notified defendants that it was exercising its right under the agreements to terminate the distributorships upon sixty days notice. Although the termination was not premised upon the outstanding debt which is the subject of this suit, plaintiff reminded the defendants in this letter of defendants' failure to satisfy all of its financial obligations under the December 12, 1985 agreement. On April 13, 1987, plaintiff filed this suit against defendants alleging an outstanding debt under the the the December 12, 1985 agreement of $41,593.46.

## CONCLUSIONS OF LAW

On a motion for the extraordinary relief of a preliminary injunction the moving party has the burden to demonstrate 1) a reasonable probability of success on the merits; 2) irreparable harm if the relief is denied; 3) that the issuance of an injunction will not result in greater harm to the non-moving party; and 4) if applicable, that the issuance of the injunction will be in the public interest. *ECRI v. McGraw–Hill, Inc.*, 809 F.2d 223, 226 (3d Cir.1987). I now hold that because the defendants have failed to demonstrate a reasonable probability of success on the merits of their claim that Fidelco was a Quincy franchisee, as that term is defined in the New Jersey and Connecticut Acts, the injunction will not issue.

In the 1960's and 1970's numerous state legislatures passed laws to regulate the proliferation of the use of franchises as a device for rapid business expansion. These laws were passed in response to the concern that the typical franchisor-franchisee relationship is rife with abuse:

> Despite characteristics of mutuality of interest, there is ... [a] divergence of interest between the franchisor and franchisee. Thus, where the franchise is for the distribution of the franchisor's products, the franchisor is primarily interested in the volume of the franchisee's sales, not necessarily the franchisee's profitability. So long as the franchisor benefits from the increased public exposure and distribution of its goods, it matters little to him whether or not a particular franchisee can continue in business

since there will always be another franchisee available to assume that place in the distribution network ... Conversely, once a franchisee has succeeded by his efforts and capital in establishing a local reputation for the franchise name, he is vulnerable to termination of the franchise, forfeiture of the business good will and the inability to realize the benefits of his business by selling it to another prospective franchisee. Thus, the reputation and good will of the network, created primarily by the efforts of each of the individual franchisees, passes back to the franchisor without compensation to the franchisee.

*Neptune T.V. & Appliance Service, Inc. v. Litton Microwave Cooking Products Division, Litton Systems, Inc.*, 190 N.J.Super. 153, 163–64, 462 A.2d 595 (App.Div.1983) (citation and footnote omitted). In order to remedy this perceived imbalance, the legislative scheme alters the normal contractual freedom of the parties engaged in a franchise relationship by prohibiting the franchisor from terminating a franchisee without just cause. Both the New Jersey Act and the Connecticut Act contain such a provision. See N.J.Stat.Ann. 56:10–5; Conn.Gen.Stat.Ann. § 42–133f. Under either act, as long as the franchisee "substantially compl[ies]" with the franchise agreement the relationship will continue indefinitely. See N.J.Stat.Ann. 56:10–5; Conn.Gen.Stat.Ann. § 42–133f(a).

In the instant case, defendants allege that since the distribution agreements between Fidelco–New Jersey and Colt, and between Fidelco–Connecticut and Colt, constitute franchise agreements under the respective state acts, plaintiff may not rely, as it does, on a purported contractual right to terminate without cause. See *Shell Oil Co. v. Marinello*, 63 N.J. 402, 307 A.2d 598 (1973) (contractual provision in franchise agreement providing for termination without cause void as against public policy), *cert. denied*, 415 U.S. 920, 94 S.Ct. 1421, 39 L.Ed.2d 475 (1974). I now hold that since the relationships between Fidelco and Colt do not fit the statutory definitions of "franchise," defendants are not members of the class sought to be protected by the franchise acts. Accordingly, the parties are free, as businessmen and women ordinarily are, to contract for the right to terminate their relationship for cause, or for no reason at all.

Initially, it should be noted that plaintiff first argues that since the agreements contain a choice of law provision which instructs the court to interpret the agreements in conformity with New York law, the New Jersey and Connecticut acts do not apply. Assuming for a moment that the choice of law provision applies to the issue now before the court,[1] and further assuming that the choice of New York law would make a difference,[2] if this court finds that the relationship between the parties amounts to a franchise as that term is used in the New Jersey and Connecticut acts, the choice of law provision contained in the agreements will not abrogate the right of the defendants to invoke the protections of those acts. *Winer Motors, Inc. v. Jaguar Rover Triumph, Inc.*, 208 N.J. Super. 666, 671–72, 506 A.2d 817 (App.Div.

---

1. A persuasive argument can be made that this provision refers to questions of interpreting the agreement itself and not the larger question of whether or not a legislature outside New York may enact laws which would subjugate all, or portions of, the agreement.

   It could also be argued that the reference to New York law would include reference to the conflict principles of that state which, assuming a true conflict, would apply New Jersey and Connecticut law because of the significant interest those jurisdictions have in regulating franchises within their borders. *See Carlos v. Philips Business Systems, Inc.*, 556 F.Supp. 769, 774 n. 4 (E.D.N.Y.), *aff'd mem.*, 742 F.2d 1432 (2d Cir.1983).

2. I note, without deciding, that it is not at all clear that the application of New York law would have any effect on the outcome of this case. New York, too, has an act regulating franchises, one similar to the Connecticut act. See N.Y. General Business Law §§ 680 to 695 (McKinney 1984 and 1987 Cum.Supp.). However, the New York law only applies when the franchisee pays a fee up front for the franchise. If the agreement to assume the obligations of General Electrical could be construed as a fee under New York law, the act would apply and there would be no conflict.

1986) ("large franchisor [may not] by insertion of a choice of law provision . . . [strike] with a pen . . . the beneficial effect of the state's remedial legislation").

### The New Jersey Act[3]

■ The New Jersey Franchise Practices Act defines franchise as:

> . . . a written arrangement for a definite or indefinite period, in which a person grants to another person a license to use a trade name, trade mark, service mark, or related characteristics, and in which there is a community of interest in the marketing of goods or services at wholesale, retail, by lease, agreement, or otherwise.

N.J.Stat.Ann. § 56:10–3(a). The scope of the act is further limited by N.J.Stat.Ann. § 56:10–4 which extends the protection of the act only to those franchises:

**3.** While the court notes that a least one court has suggested that the New Jersey and Connecticut acts are "nearly identical," *see Carlos v. Philips Business Systems, Inc.*, 556 F.Supp. 769, 774 (E.D.N.Y.), *aff'd mem.*, 742 F.2d 1432 (2d Cir.1983), it is the opinion of this court that the Connecticut act is somewhat narrower in scope than its New Jersey counterpart. This opinion is based in part on the perception that the statutory definition of a franchise as an agreement to sell goods or services "under a marketing plan or system prescribed in substantial part by a franchisor," in which the operation of the franchise "pursuant to such plan or system is substantially associated with the franchisor's trademark," Conn.Gen.Stat.Ann. § 42–133e(b), amounts to a less inclusive definition than that found in the New Jersey act, if for no other reason than the Connecticut act's emphasis on the words "plan," "system," and "substantial." In any event the Connecticut act cannot be construed to be more inclusive. Therefore, since I now hold that the relationship between the parties does not create a franchise under New Jersey law, I need not address the issue under the "identical" or less inclusive Connecticut act. I will therefore limit my primary discussion to those cases applying New Jersey law.

**4.** There is no dispute between the parties that Fidelco purchased more than $35,000 worth of goods in the twelve months preceding April 13, 1987. See N.J.Stat.Ann. § 56:10–4(2).

However, plaintiff does contest defendants' assertion that they satisfy the other two prongs of the test. Plaintiff's first contention that the agreement does not "contemplate or require" that defendants maintain a place of business in

". . . (1) the performance of which contemplates or requires the franchisee to establish or maintain a place of business within the State of New Jersey, (2) where gross sales of products or services between the franchisor and franchisee . . . shall have exceeded $35,000.00 for the 12 months next preceding the institution of suit pursuant to this act, and (3) where more than 20% of the franchisee's gross sales are intended to be or are derived from such franchise."

*Id.* Assuming, without deciding, that defendants have met their burden of demonstrating that the relationship between the parties satisfies 56:10–4,[4] the issue before the court is two-fold: (1) Does Colt, in a written agreement, grant Fidelco a license to use its trade mark, and (2) Do Colt and Fidelco have a "community of interest" in the sale of Quincy compressors.

New Jersey is of little merit. First, the agreement expressly recognizes defendants' place of business in Newark. Even if one assumes that that reference serves little more than identifying the parties to the agreement, the uncontradicted affidavit of Fidelco's President, Daniel Rubino, that unspecified Quincy representatives toured the Newark facility demonstrates that the parties at least contemplated a New Jersey location.

Another issue is troubling to the court. The statute requires that 20% of franchisee's gross sales derive from, or are intended to be derived from, the franchise. Putting aside the language regarding "intended" sales which would presumably recognize situations in which acts of the franchisor prevent the franchisee from meeting the statutory minimum, an issue not presented in this case, in order to prove the statutory minimum common sense dictates that the most direct method would be to compare the defendants' total gross sales to the gross sales figures of Quincy products. Curiously, because one would assume that those figures are readily available to defendants and are certainly not available to plaintiff, that is not the method chosen. Rather, defendants' president's affidavit lists the net cost of goods from Quincy, the net cost of goods from all vendors, and then asserts rather baldly that since all mark-ups are "approximately the same" the ratio of Quincy net sales to total net sales must approximate the ratio of Quincy gross sales to total gross sales, the figure required by the statute. There is no explanation why the most direct, and presumably more accurate method was not used. However, for the purposes of this motion I will accept defendants' roundabout figures but refrain from deciding the issue at this juncture pending discovery.

## The Trademark License

The first New Jersey case to deal authoritatively with the issue of what kind of license satisfies the franchise act is *Finlay & Associates v. Borg–Warner*, 146 N.J.Super. 210, 369 A.2d 541 (Law Div.1976), *aff'd per curiam on other grounds*, 155 N.J.Super. 331, 382 A.2d 933 (App.Div.) (review limited to anti-trust holding), *certif. denied*, 77 N.J. 467, 391 A.2d 483 (1978). In that case, the distributor-plaintiff argued, in the absence of a written license, that the defendant's acts of supplying plaintiff with certain advertising and promotional materials upon which plaintiff could affix its name, and acquiescing in the listing of Borg–Warner's products in Finlay's sales catalogue, constituted a "license" to use a trademark. Rejecting that contention, the court noted that if that were the test every distributor who made known to the public the products he carried could be a franchisee under that act. That, in the court's opinion, was not the intent of the legislature:

> Although the word "license" has many applications, it means in this statute to use as if it is one's own. It implies a proprietary interest and this is what the legislature intended in effect. Mere oral permission would not be enough under the statute ... The trademark, tradename reference means and implies use of that name in the very business title of the franchiee and a holding out or perhaps representation to the public of some special relationship or connection. Simply selling goods or distributing materials which bear the manufacturer's name or trademark does not "license" use of the "trademark."

*Finlay*, 146 N.J.Super. at 219, 369 A.2d 541. Although citing *Finlay* with approval, the continuing validity of this rather narrow definition of "license" is somewhat cast into doubt by the subsequent decision of the Appellate Division in *Neptune T.V. & Appliance Service, Inc. v. Litton Microwave Cooking Products Division, Litton Systems, Inc.*, 190 N.J.Super. 153, 462 A.2d 595 (App.Div.1983). In *Neptune*, an appliance repair business was designated by Litton as "an Authorized Litton service source" under a written agreement which incorporated a detailed "Service Policy and Procedural Guide." Id. at 157, 462 A.2d 595. This manual specified how warranty work was to be performed, required that technicians attend Litton training sessions, and even explained how customer complaints were to be handled. This elaborate and express agreement, Litton's authorization of Neptune as an authorized service center, and the fact that approximately 50% of Neptune's business derived from its work with Litton products, combined to convince the court that Litton had granted Neptune a license to use its trademark *as a franchisee* as that term is used in the New Jersey act.

To be sure, the case at bar falls somewhere in between *Neptune* and *Finlay*. Unlike *Finlay*, there is a written agreement between the parties which to some extent grants Fidelco use of Colt's marks. On the other hand, it is not at all clear that the relationship between Colt and Fidelco in this case is so analogous to the one between Litton and Neptune T.V. that the court must come, or is even likely to come, to the conclusion that Colt "licensed" the use of the Quincy mark. Unlike *Neptune* the agreements between Colt and Fidelco do not contain the elaborate and detailed specifications for providing warranty service found in the *Finlay* case. On the contrary, in the instant case the contractual provision granting use of Colt's marks does not even mention service.[5] This is a critical distinction when one considers that the New Jersey act defines a franchise as a "written arrangement ... to ... license ... use [of] a trade name...." N.J.Stat. Ann. 56:10–3(a), *cf. Finlay*, 146 N.J.Super. at 219, 369 A.2d 541 (mere oral permission to use mark not a license under the act); *American Business Interiors, Inc. v. Haworth*, 798 F.2d 1135, 1140 n. 3 (8th Cir.

---

5. While there is a reference to designating Fidelco as an authorized service center in the December 12, 1985 agreement that is not the document defendants rely on to establish the grant of a license.

1986) (New Jersey act narrower because it does not include oral arrangements).

Even if one assumes that the literal terms of the statute do not apply here because of other circumstances, there are other indications that this apparently oral agreement to designate Fidelco as a service center does not fall within the spirit of *Neptune*. First, photographs supplied by plaintiff indicate that one must first enter the side door and approach a service desk before one realizes that the Fidelco facility is a Quincy service center. There is absolutely no indication from the road, for example, that the Fidelco–New Jersey facility is anything more than what it says it is— Argo Pump and Compressor Company. Under the circumstances of merely an oral agreement, where the rights and duties of the parties are so undefined, I am not at all prepared to say that Argo "holds itself out to the public" in the same way Neptune T.V., a retail service facility, was portrayed as the Litton service center.

Under the circumstances it is much more logical to assume, especially given the lack of a written agreement, that Quincy orally authorized Fidelco to provide warranty service as an adjunct to the sales Fidelco was making as a distributor, unlike Neptune which could *only* function as service center. Further, there is no indication that Fidelco is nearly as dependent on Quincy warranty repairs as Neptune was on Litton repairs. In short, while this issue could be subject to later proof, I now hold, within the context of this preliminary injunction application, that defendants have failed to present to the court a written agreement in which Colt granted a "license" to use the Quincy mark as that term is used in the New Jersey act.

*A Community of Interest*

■ Be that as it may, even if I assume that Colt did license use of the Quincy mark to Fidelco, I hold, in the alternative, that defendants have failed to meet their burden of demonstrating the existence of the second prong of the statutory definition of "franchise," i.e., a "community of interest in the marketing of goods and services" between themselves and Colt. As the *Neptune* court recognized, not only does the statute fail to define that phrase, judicial interpretations are few and far between. *Neptune*, 190 N.J.Super. at 161, 462 A.2d 595. At the outset, it should be noted that courts have consistently held that the mere fact that two parties share in the profits realized when a product makes its way from manufacturer to ultimate consumer is insufficient to create a franchise. *Neptune*, 190 N.J.Super. at 165, 462 A.2d 595, *Finlay*, 146 N.J.Super. at 219, 369 A.2d 541. Obviously without more, every manufacturer who does not sell direct necessarily designates every middleman who makes a profit as a franchisee.[6] The difficulty arises in defining that something "more." The *Neptune* court recognized a "relationship ... of continuing advantage and interdependence," but further recognized that an arrangement that lacked "the symbiotic character of a true franchise ... and the consequent vulnerability of the alleged franchisee to an unconscionable loss of his tangible and intangible equities[ ]" was not a franchise under the act. This latter prerequisite is a critical element in analyzing the statute. As one court has remarked, it is important to keep in mind the intended beneficiaries of the franchise acts. The danger exists that if the act's reach is defined too broadly that it will inevitably "interfere with the normal functioning of the marketplace" by conveying to a contractual party of equal bargaining power the right to continue a business relationship indefinitely. Absent a need to protect the victim of economic disparity, such a result would amount to "legislative overkill." *Grand Light & Supply Co., Inc. v. Honeywell, Inc.*, 771 F.2d 672, 677 (2d Cir. 1985)

In analyzing whether or not an alleged franchisee is one of the class of persons

---

**6.** Defendants rely heavily on the assertion that since almost all of Colt's sales are through distributors, Colt is utilizing the labor and capital of others to promote the Quincy name. While there is some merit to this observation in the sense that it at least raises the spectre of unfair advantage, that fact alone does not make every manufacturer who fails to sell direct a franchisor.

sought to be protected by the act, courts have focused on certain indicia of the extent to which the supposed franchisor exercises "control" over the supposed franchisee. While there is no complete "laundry list" the following factors are often considered:

a) retention of the right to audit books and inspect the premises;

b) dictation of the franchisee's facilities or physical plant;

c) control over the standards for hiring and the conduct of employees;

d) the establishment of sales quotas and prices;

e) the provision of management training and financial support.

See *id.* at 678. Although this list is not complete, when it is compared to the facts of this case and the indicia defendants offer to show a franchise relationship, I am compelled to conclude that defendants fall outside the protection of the New Jersey act.

Defendants essentially offer the following as proof of the franchise relationship exists in this case:

1) Quincy holds sales meetings at Fidelco facilities during which new products are introduced and explained to Fidelco sales representatives;

2) Quincy provides sales support in the form of promotions, direct mail solicitation materials such as pamphlets, and product line brochures;

3) Quincy field representatives will on occasion accompany a Fidelco salesman in order to help close a sale;

4) Quincy and its distributors participate in cooperative "yellow page" advertising, makes available a Quincy advertising man-

ager, and refer inquiries from potential customers to the nearest local distributor;

5) Quincy requires Fidelco to provide "satisfactory evidence of financial responsibility ... not less than once a year;"

6) Fidelco provides warranty service for Quincy products and is required to stock Quincy parts; and

7) Quincy and Fidelco together work out mutually acceptable sales goals.

There is a temptation to look at this rather long list of cooperative efforts and conclude that the obviously close relationship between Colt and Fidelco amounts to a franchise. A close examination of each of these examples of cooperative spirit, however, reveals that they are precisely that—cooperation. What is missing from this case, on the present record, is the indicia of interdependency and control necessary for a franchise. Although defendants have chastised the court at oral argument for viewing the modern world of franchises too narrowly, this court does recognize that a distributor *can* be a franchise. That alone, however, is not enough.[7] To state simply, as defendants all but do, that courts have held distributors to be franchisees begs the question. What defendants have failed to demonstrate is that this particular distributor is subject to the whim, direction, and control of a more powerful entity whose withdrawal from the relationship would shock the court's sense of equity. *See Neptune*, 190 N.J.Super. at 165, 462 A.2d 595 (true franchise relationship creates possibility of "unconscionable loss of tangible and intangible equities"). When each of the indicia offered by defendants is closely scrutinized what appears is a picture of two parties of relatively equal bargaining position engaged in a common pursuit, each supplying independent advice and skill, to-

7. The court's research has found only one case that arguably stands for the proposition that a distributor is likely to be a franchisor. In that case, *Carlo C. Gelardi Corp. v. Miller Brewing Company*, 421 F.Supp. 233 (D.N.J.1976) (*Gelardi I*), the court held that the plaintiff was likely to succeed on its claim that a beer distributorship was a franchise under the New Jersey act. However, the sole issue joined by the parties was whether or not the agreement between them contemplated or required a place of business in New Jersey. The court did not pass on, but merely assumed, that the distributor and the manufacturer had a "community of interest." However, the Appellate Division's subsequent decision in *Neptune* significantly narrowing the definition of "community of interest" renders *Gelardi I* suspect as precedent on that issue and I, therefore, decline to follow it.

ward a common goal. That, in this court's opinion, is not a franchise.

*Sales Meetings*

Defendants attempt to make much of the fact that Quincy sales representatives visit Fidelco to acquaint its salesmen with the Quincy line. Presumably defendants offer this fact to fall under the rubric that a franchisor participates in the training of the franchisee's employees. Defendants' argument, however, misses the mark. Here, unlike the typical relationship, plaintiff exercises no control over the number of Fidelco's employees, their character, dress, or academic, technical, or professional qualifications. All Colt apparently asks is that Fidelco salesmen familiarize themselves with the Quincy line of goods. This set of facts distinguishes the cases relied upon by defendants.

In *Carlos v. Philips Business Systems*, 556 F.Supp. 769 (E.D.N.Y.) (applying New Jersey and Connecticut law), *aff'd mem.*, 742 F.2d 1432 (2d Cir.1983), the plaintiff engaged in the retail sale of defendant's Norelco dictating equipment. Under the express terms of the agreement Carlos "was required to send representatives ... to sales meetings ... including training at Norelco University ... [and] to maintain proper coverage of its territories with salespeople." *Id.* at 771. Clearly, this latter requirement was a directive to hire a certain number of salespersons and, in fact, at one point Philips directed Carlos to increase his sales staff. *Id.* at 772.[8]

Similarly, in *American Business Interiors v. Haworth, Inc.*, 798 F.2d 1135 (8th Cir.1986), the agreement between the parties "obligated" the authorized dealer to "present Haworth products to the public in a certain manner, using employees trained by Haworth." This court has searched the four corners of the agreement in this case, and in fact the entire record, in vain for

any indication that Colt required anything more than Fidelco to "aggressively sell its product." Unlike *Carolos* and *Haworth*, how that end was to be accomplished, and by whom, was left entirely to Fidelco.

*Promotional and Advertising Materials*

It is conceded that Colt provided Fidelco with forms from which a direct mail advertising plan could be implemented, provided sales brochures, and shared "yellow pages" costs. The key word, however, is "provided." How defendants can rely on the mere fact that plaintiff supplied promotional materials upon which defendants placed its business name after the *Finlay* decision is unclear. That court specifically accorded such a fact little or no weight and nothing in *Neptune* alters that holding. As for "yellow pages" advertising, while the shared costs do suggest a symbiotic relationship, unlike *Carlos*, Colt does not specify nor require any particular advertising.[9] Clearly, the "yellow page" mock-up is offered as a suggestion and is not required. Similarly, one need only read the direct mail letter to arrive at the conclusion that Colt merely offers promotional services as sales support:

> A new beautiful mailer for distributors ... *is now available* ... We have also drafted and enclosed an introductory letter which *you could use* with the mailer. *You could tailor it with some facts about your own operation and service capabilities* ... For starters, *you may want* to issue the brochure to your existing customer base ... Further *you may choose* to use one of the many directed mail lists available locally ... There are companies who can put together your entire campaign.

Affidavit of Daniel Rubino, Exhibit B (emphasis added). "You could use ..." "You may choose ..." To characterize this kind of freedom on the part of the distributor as

---

8. There are other facts upon which to distinguish *Carlos*. In that case there was a virtual identity between Norelco and Carlos. For example, over 90% of Carlos's sales derived from Norelco products. One seemingly innocuous fact, but one quite telling, was the simple fact that Carlos answered the telephone "Norelco." *Carlos*, 556 F.Supp. at 776.

9. At best, Quincy provides the phone number of, and suggests defendants call, a gentleman whose title is Advertising Manager. See Affidavit of Daniel Rubino, Exhibit H. There is no allegation that Quincy exercises any mandatory control over defendants' advertising plans.

a franchise perverts the statutory definition. Clearly, Fidelco is free to accept, or reject, any or all of Colt's proffered assistance. The fact that Fidelco did accept some of the support means nothing more than Fidelco realized that it might sell more product that way. However, as I have already indicated, the mere fact of increased sales, and mutual profits, does not create a franchise. *Finlay*, 146 N.J.Super. at 220, 369 A.2d 541 (agreement lacked "economic dependency except to the [inconsequential] extent plaintiff by its own choice elected to concentrate on the line of merchandise it preferred for whatever business reasons, including profit motive").

*Financial Responsibility and "Sales Goals"*

Although defendants treat these issues separately they are really different sides of the same coin. In a typical franchise relationship the franchisor sets certain sales quotas that the franchisee must meet. See *Carlos*, 556 F.Supp. at 772 (defendant "set" quotas and required periodic sales reports and individual reports of every sale including the name of the buyer). Part and parcel of this relationship are sales reporting and auditing requirements that keep the franchisor abreast of the successes and failures of the franchisee. See *id.; cf. Dunkin' Donuts of America v. Middletown Donut Corp.*, 100 N.J. 166, 171, 495 A.2d 66 (1985) (franchise agreement called for accurate sales records).

In the instant case, defendants point to paragraph 6 of the agreement as proof that Colt monitors Fidelco's financial performance. Further, defendants assert that Colt sets sales performance parameters. Once again defendants gild the lily. Paragraph 6 states:

> Distributor shall furnish satisfactory evidence of financial responsibility upon request by Quincy Compressor's Credit Department, but not less than annually.

Answer and Counterclaim, Exhibit A. When viewed within the context of the entire agreement between the parties this provision is nothing more than a standard contract clause found in any agreement that contemplates the sale of goods between links in a distribution chain on short term credit. Paragraph 6, when fairly read, amounts to nothing more than the right of Colt to assure itself that it is not extending credit to an impecunious distributor. It cannot be read to contemplate the pervasive monitoring of sales found in *Carlos*.

As for the so-called sales quotas, they are not really "quotas" at all. As contrasted with arrangements where a franchisee must sell × number of products in order to maintain its status as a franchisee, the relationship between Colt and Fidelco amounts to little more than a cooperative effort to increase sales, hardly a sinister goal for a manufacturer. Absent is the coercive mandate to keep pace, with the pace set by the manufacturer:

> 1987 SALES GOAL AND % CHANGE: These fields are to be *filled in by you and our District Representative during your meeting*. They should be realistic, and yet challenging goals; *established on the basis of your plans* for promoting Quincy in 1987.

Affidavit of Daniel Rubino, Exhibit J (emphasis added). Without question, if these are quotas, they are self-imposed.

*Warranty Service*

Like defendants' misplaced reliance on the use of sales brochures rejected in *Finlay*, defendants attempt, without distinguishing *Neptune* to use the fact that Fidelco performed service on Quincy products to establish a franchise. The court in *Neptune*, expressly held that providing warranty service does not create a "community of interest" within the contemplation of the statute. Defendants have pointed to no facts which should preclude application of that rule to the facts of this case.

In sum, each and every fact offered by defendants indicates two large autonomous organizations which share an interest in the sale of Quincy products. One look at Fidelco's sales brochure proves this point. See Answer and Counterclaim, Exhibit C. In that brochure Fidelco is portrayed as an old and far-flung group of knowledgeable professionals, strong and independent—

"The Network for Sales and Service." There is absolutely no indication that Fidelco is as dependent on Quincy as it would now have the court believe. In fact the contrary appears to be true. Defendants list eight different brands of compressors, at least one of which defendants' counsel represented at oral argument was in direct competition with the Colt products. Defendants are, by their own admission, as plaintiff says they are—an industrial supermarket.[10] When all of these circumstances are considered this court is not prepared to say that the relationship between Fidelco and Colt is of the kind sought to be regulated by the New Jersey Franchise Practices Act. Because the Connecticut act is no more broad in scope than its New Jersey counterpart, relief under that statute is denied as well.[11]

It is therefore concluded that since defendants have failed to demonstrate that the relationship between the parties satisfies the statutory definition of a franchise under either the New Jersey or the Connecticut act, and defendants have therefore failed to demonstrate a likelihood of success on the merits of the counterclaim, the motion for a preliminary injunction must be denied.

The court will enter an appropriate order.

---

**10.** At least one state, Delaware, has exempted from the protection of its act retailers who sell the brands of more than three manufacturers. Obviously, a retailer who sells numerous brands cannot be economically dependent on any one brand and therefore falls outside the protection of the act. *See Globe Liquor Co. v. Four Roses Distillers Co.,* 281 A.2d 19 (Del.), *cert. denied,* 404 U.S. 873, 92 S.Ct. 103, 30 L.Ed.2d 117 (1971). While the New Jersey act contains no such restriction, the underlying rationale—that the act seeks to protect those who stand to lose the most—is the same. *Cf. Finlay,* 146 N.J.Super. at 220, 369 A.2d 541 (plaintiff may continue its business without interruption and replace defendant's line with that of competitor); *Grand Light,* 771 F.2d at 677 (plaintiff's loss of defendant's line not catastrophic).

**11.** See *supra* note 3. Those cases interpreting the Connecticut act are consistent with my holding in this case. See e.g. *Muha v. United Oil Company, Inc.,* 180 Conn. 720, 433 A.2d 1009 (1980) (since retailer was not subject to any right of oil company to exercise any control over the business or operations of gas station no franchise existed); *McKeown Distributors v. Gyp–Crete Corporation,* 618 F.Supp. 632 (D.Conn.1985) (defendant did not dictate advertising or prescribe marketing plan); *Consumers Petroleum of Connecticut, Inc. v. Duhan,* 38 Conn.Supp. 495, 452 A.2d 123 (Conn.Super.Ct. 1982) (right to approve advertising, prescribe hours and number of employees not a franchise).